## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

|  |  |
|---|---|
| YUN CHAU LEE, on Behalf of Herself and All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  v.<br><br>K12 INC., NATHANIEL A. DAVIS, and TIMOTHY MEDINA,<br><br>      Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Yun Chau Lee ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against K12 Inc. ("Company" or "K12"); Nathaniel A. Davis ("Davis"), K12 Chief Executive Officer ("CEO"); and Timothy Medina ("Medina"), K12 Chief Financial Officer ("CFO"), based upon, *inter alia*, the investigation conducted by and under the supervision of Plaintiff's counsel, which included a review of the Company's public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company and readily obtainable information. Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company, Defendant Davis, and Defendant Medina. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of K12 stock between April 27, 2020 and September 18, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      K12 Inc. is a Delaware company headquartered in Herndon, Virginia. K12 is a technology-based education company that provides proprietary and third-party educational curriculum, teacher training, administrative support, information technology support, software systems and educational services.  The Company operates virtual learning systems worldwide.  As a provider of online content and educational services, K12's success and financial and operational well-being is critically dependent on its technical capability and ability to provide and maintain well-functioning and operational information technology systems and infrastructures.

3.      Beginning in March 2020, the global pandemic has forced school districts across the country to close in-class instruction and shift all learning activities to online and blended instruction. K12, which had a history of reporting disappointing financial results during the 10-month period prior to the school closures, saw a unique opportunity to revamp itself by seizing a large stake in the rapidly growing market for online education.  Accordingly, almost immediately following the nationwide closure of in-class instruction, K12 embarked on an intensive campaign to convince the market that it was well positioned and technologically capable to accommodate and service the massive surge of students, parents, and teachers who were turning to online education.  To do that, K12 and the Individual Defendants disseminated dozens of false and misleading statements in which they touted the technological wherewithal of the Company's online learning platforms, cybersecurity protocols,

preparedness for large volumes of students, as well as the administrative support and training that K12 would provide to students, parents, and teachers.

4.      K-12's self-promoting campaign worked well.   In reliance on K12's false and misleading statements, the investing community expected K12 to experience a great boost in its financials and successfully capitalize on the opportunities presented to it by the global pandemic.   For example, on July 15, 2020, when K12 common shares traded at around $43, Citron Research published a $100 price target for K12. Citron Research's prediction was based on its belief that K12 was "best positioned to take advantage of [the] megatrend [of shifting to full online education]."   Similarly, securities analysts gradually increased K12's rating, based on the Company's executives' commentary regarding present enrollment trends.   As a result of K12's self-promoting campaign, the price of K12 shares skyrocketed to its all times high of $51.60 on August 5, 2020 – a surge that was unmatched by any of K12's competitors.

5.      In reality, however—and unbeknownst to the investing public—K12 was not ready to take on the increased load and lacked the technological capabilities to support and service the massive increase in traffic on its website and its learning platforms.   Indeed, K12 lacked adequate infrastructures to enable thousands of students and teachers to logon to their systems and utilize the audio and video features necessary for remote instruction.  Additionally, despite K12's representations to the contrary, its cybersecurity measures and protocols were so weak that a 16-year-old high school junior successfully breached the network on which K12 was critically dependent, and thereby crippled K12's online platform, and the provision of its services for hundreds of thousands of students for several days.   The issues relating to the functionality and support of K12's platforms were only compounded by the lack of training and instruction provided to teachers and parents, who received little support and insufficient hands-on experience and training prior to the platform's launch.

6.      Contrary to the facts asserted by K12, reports began to surface that K12's training for

3

teachers in Miami-Dade County—one of the nation's largest school districts—had been woefully inadequate.  For example, on August 26, 2020, teachers in Miami-Dade County School District reported that the training provided by K12 was ineffective and "unacceptable" as they lacked the instruction necessary to utilize K12's platform.

7.      On this news, the price of K12 common shares sharply fell by 7% over the course of two trading days, to close at $37.70 on August 27, 2020, on unusually high volume.

8.      Once classes began on August 31, 2020, the situation worsened.  K12 experienced major technical issues and disruptions with teachers and students of Miami-Dade County being unable to even log into the platform and utilize its contents, which prompted local officials to publicly scold K12 for being "not ready" for the opening of the school year.  By the third day of classes, September 2, 2020, Miami-Dade County students and teachers reported numerous additional technical issues and a total of twelve intermittent cyberattacks that led to K12's learning platform effectively being dysfunctional.  In response to the overwhelming amount of complaints by outraged parents, Miami-Dade County School District called a Board meeting to discuss K12's many failures.  During the meeting, Miami-Dade County Public Schools Superintendent Alberto Carvalho revealed that he never signed the $15.3 million no-bid contract with K12 and the school district had never paid K12 for the provision of its services and products.

9.      On this news, the price of K12 common shares fell 10.5% over the course of two trading days, to close at $34.89 on September 3, 2020.

10.     A week later, after another Board meeting that lasted for over 13 hours and included 400 speakers, the Miami-Dade County Public Schools Board voted to terminate their $15.3 million contract with K12 on September 10, 2020.

11.     On this news, the price of K12 common shares again fell drastically, by 11.5%, to close at $30.55 on September 10, 2020, on unusually high trading volume.

12.     Meanwhile, the Beaufort County School District in South Carolina engaged K12 to provide virtual learning programs for their students.  However, the introduction of the program had to be delayed until the second week of instruction.  Soon after, Beaufort County School District board member John Dowling stated that he had lost confidence in K12's ability to provide educational solutions for the district and moved to terminate the contract, which happened two days later.

13.     On this news, the price of K12 common shares fell 4.9%, to close at $27.21 on September 18, 2020, on unusually high trading volume.

14.     Throughout the Class Period, Defendants made materially false and misleading statements, and failed to disclose material adverse facts about the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) K12 lacked the technological capabilities, infrastructures, and expertise to support the increased demand for virtual and blended education necessitated by the global pandemic; (ii) K12 lacked adequate cyberattack protocols and protections to prevent the disabling of its computer system; (iii) K12 was unable provide the necessary levels of administrative support and training to teachers, students, and parents; and (iv) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's business, operations, and prospects and/or lacked a reasonable basis and omitted facts.

15.     As a result of the Defendants' wrongful acts and omissions, and the precipitous decline in the market value of K12's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions were made or omitted , and the subsequent damages took place in this Judicial District.  Pursuant to K12's most recent annual report on Form 10-K, as of July 31, 2020, there were 41,309,402 shares of the Company's common stock outstanding.  K12's common stock trades on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in K12's common stock located within the U.S., some of whom undoubtedly reside in this Judicial District.

19.     In connection with the acts alleged in this Complaint, K12, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

## PARTIES

20.     Plaintiff is a resident of Sauk Centre, Minnesota.  As set forth in the attached Certification, incorporated by reference herein, Plaintiff acquired K12 shares during the Class Period, at artificially inflated prices, and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.     Defendant K12 is a Delaware corporation with a principal place of business at 2300 Corporate Park Drive, Herndon, Virginia 20171.  K12 shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "LRN."

22.     Defendant Nathaniel A. Davis ("Davis") has served as the Company's CEO since February 2018 and as Chairman since June 2012.

23.     Defendant Timothy Medina ("Medina") has served as the Company's CFO since his

appointment in April 2020.

24.     Defendants Davis and Medina are sometimes referred to herein as the "Individual Defendants." The Individual Defendants, together with K12, are sometimes referred to herein as the "Defendants."

25.     The Individual Defendants possessed the authority to control the contents of statements made by K12 in the Company's reports to the SEC, press releases and presentations to securities analysis, money and portfolio managers and institutional investors, *i.e.,* the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Due to their positions with K12, and access to K12's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. The Individual Defendants are liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Background

26.     K12 is a technology-based education company that provides proprietary and third-party educational curriculum, software systems and educational services designed to facilitate individualized learning for students, the majority of which are in kindergarten through 12th grade, or K-12.  The Company primarily targets virtual and blended public schools, school districts, charter schools, and private schools that utilize varying degrees of online and traditional classroom instruction, and other educational applications.  The overwhelming majority, almost 90%, of K12's revenue comes from contracts with managed public school programs.

27.     Since April 2019, the Company experienced a steady decline in the price of its common shares caused by disappointing performance metrics, including reporting significantly higher net losses

than expected and decreasing net income.  In fact, between April 2019 and February 2020, the price of K12 common shares declined from approximately $37 on April 16, 2019 to $15.86 on February 10, 2020, a decline of more than 57% over the course of ten months.

28.     While the COVID-19 pandemic ravaged many industries, due to the overall shift to blended and remote learning, K12's prospects seemingly began to improve.   Around March 2020, nearly all elementary and high schools nation-wide shifted to virtual operation.   Online learning providers, like K12, saw a boom in enrollment as parents and educators sought an alternative to the traditional classroom setting.  K12 was presented with a unique opportunity to leave its struggles in the past and revamp itself into the nation's leading provider of online curriculum and other educational services.  In its effort to seize as much of the market as possible prior to the opening of the new school year in September 2020, K12 and the Individual Defendants embarked on a months-long intensive campaign to convince the school districts of its preparedness and technical wherewithal to service the unprecedented surge of online students.

29.     As a result of K12's aggressive public self-promoting campaign, the misrepresented material facts and omissions, K12's stock price reached an all-time high during the pandemic, closing at $51.60 on August 5, 2020, representing a 106% increase in the price of its shares since the beginning of the Class Period.  Unlike K12, its competitors fared worse, experiencing a more moderate increase in the price of their shares. For example, Rosetta Stone experienced approximately 71% increase while Pluralsight experience 40% increase.

## Materially False and Misleading Statements
## Issued During the Class Period

30.     The Class Period begins on April 27, 2020. On that day, K12 issued a press release announcing its financial results for the third fiscal quarter ended March 31, 2020.  In the press release, Defendant Davis touted K12's "core competency" in aiding schools and school districts operation of

their online programs, stating in relevant part:

> Looking forward, K12 now sits squarely in the middle of one of the most important changes in our society – distance and digital learning will become an even more important part of how our children learn. ***Our core competency in helping public school districts, private schools, and charter schools operate their online programs positions us well given how the education market is likely to change.***

31.     On the same day, April 27, 2020, K12 filed its quarterly report on SEC Form 10-Q for the third fiscal quarter 2020 ("3Q 2020 Report").  In it, the Company described their capabilities, including the provision of learning systems for varying degrees of online learning:

> The Company's learning systems combine curriculum, instruction and related support services to create an individualized learning approach.  ***The Company's learning systems are well-suited for virtual and blended public schools, school districts, charter schools, and private schools that utilize varying degrees of online and traditional classroom instruction, and other educational applications.***
>
> *       *       *
>
> The Company works closely as a partner with public schools, school districts, charter schools, and private schools, enabling them to offer their students an array of solutions, including full-time virtual programs, semester courses and supplemental solutions. In addition to curriculum, systems and programs, the ***Company provides teacher training, teaching services, and other academic and technology support services.***

32.     With regard to the managed public school programs, which represents 89% of K12's total revenue — the 3Q 2020 Report again provided assurances that K12 offers administrative support and information technology to support the range of products K12 offers to its customers:

> ***The Company provides an integrated package of systems, services, products, and professional expertise that we administer to support an online or blended public school.*** Contractual agreements generally span multiple years with performance obligations being isolated to annual periods. ***Customers for these programs can obtain the administrative support, information technology, academic support services, online curriculum, learning systems platforms and instructional services under the terms of a negotiated service agreement.*** The schools receive funding on a per student basis from the state in which the public school or school district is located. Shipments of materials for schools that occur in the fourth fiscal quarter and for the upcoming school year are recorded in deferred revenue.

33.     In the sections of the 3Q 2020 Report, under the heading of "Risks and Uncertainties" and "Risk Factors," the Company did not adequately disclose risks relating to cybersecurity, data privacy, data breaches, or potential technological weaknesses and vulnerabilities of its platform.  In fact, the Company's 3Q 2020 Report never once mentioned cyber security, data breaches, or information security as one of the very real risks that the Company was facing.  These omissions were material.

34.     Appended as Exhibits 32.1 and 32.2 to the 3Q 2020 Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that "the [3Q 2020 Report] fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934," and that "the information contained in the [3Q 2020 Report] fairly presents, in all material respects, the financial condition and result of operations of the Company."

35.     On the same day the 3Q 2020 Report was filed, April 27, 2020, the Company held an Earnings Call with analysts to discuss the Company's financial results and operations.  During the Earnings Call, Defendant Davis touted the Company's financial results, including the fact that the Company "beat [its] estimates across the board: revenue, adjusted operating income and capital expenditures" which according to him was a result of the "***ongoing strength of [K12's] core business[.]*** As to K12's technical abilities, Defendant Davis assured investors that the transition from physical to online learning was flawless for other K12 customers:

> The pandemic has disrupted academic plans and goals for so many students across the U.S. and across the globe.  All brick and mortar schools closed in the U.S. and it was a scramble by many to figure out just how does this virtual schooling thing work.  However, **the academic experience for most K12 powered programs was essentially school as usual.**

36.     Additionally, Defendant Davis made courageous claims regarding K12's readiness and technical abilities to service and administer the sudden surge of online students caused by the

pandemic, stating as follows:

> Let's talk about the upsides of the pandemic in our business. As I've already said, it's horribly unfortunate for so many people all around the world. **But we're in the business that helps schools and students in situations exactly like this.** When the pandemic first started to impact brick and mortar schools, **our phones begin to ring off the hook and we saw a sharp increase in traffic on our website. We reached nearly 1 million unique visitors to the k12.com website in February and March, which is a 49% increase year-over-year.** Many of those visitors built out lead submission forms. In fact more than 100,000 lead submission forms were completed by parents in the last 2 month [sic], a 57% increase over the same time last year.

37.    As to K12's technical support of the thousands of new students whose school districts shifted to virtual learning, Defendant Davis highlighted the Company's efforts in providing solutions supporting and servicing the impacted communities:

> Our company has also stepped up in support of communities that were impacted by the nationwide school closures. This includes offering free online curriculum, platforms, training and technical assistance to students, their families and to school districts. We're also offering free webinars on best practices for teachers and families, who have been thrust into an online environment for the very first time. **To date nearly 70,000 students, teachers and families have signed up for these programs and webinars.** These efforts continue to raise interest in and awareness of the blended and online classroom and of K12's expertise in this area.
>
> **Lastly, we're also working closely with dozens of school districts on solutions that will help them educate students remotely.** Some school districts are already using our curriculum under the 30-day free offer, I mentioned. Others are using our supplemental content, such as Stride and Big Universe. Many are using a mixture of both. So far more than 30,000 students are being supported by these promotional programs in the current school year. **We believe a larger longer-term opportunity exists as districts figure out just how they will incorporate online learning into their regular curriculum and enter this full continuity plan.**

38.    During the Q&A portion of the Earnings Call, Defendant Davis further assured investors of K12's strength. When asked about the time it takes to establish a new school with K12's system, Davis said that COVID-19 was "***a positive tailwind***" that is putting the onus on the school system, saying that "states come to us and say, hey, can we do something here?" He went even further, professing that online school programs are the way forward if schools "want to be in a position to be

able to help students and help your community and help your state." To this end, Defendant Davis made investors aware of ongoing negotiations and K12's bidding process with a "couple of very large school districts" and "two large cities."

39.    Defendant Davis also discussed the increased demand from school districts for K12 to "train[ ] their teachers in district schools and how to teach an online environment and how to put a full program in place," which K12 planned to meet by providing "training, professional development of teachers, who can learn how to teach in an online environment. . . ."

40.    Defendant Medina echoed these sentiments, saying that "[K12]'s core business continues to perform well and the increased awareness of our virtual options positions [K12] for accelerating growth over the long-term."  Defendant Medina also took the time to assure investors of K12's continued success, stating:

> ***K12 is very well positioned to grow in spite of the uncertainty in the general economy.*** We are in a strong financial position and have a solid balance sheet with a strong cash position. States have committed to fund public schools during the crisis and we are seeing increased demand for our services. ***We believe the effects of COVID-19 will be a lasting tailwind to online education and especially the K12's business model.***

41.    On July 6, 2020, Miami-Dade County Public Schools announced their reopening plan, which involved the use of K12's online learning platform, "My School Online."  The online instruction was offered as an option for families who wanted an alternative to face-to-face instruction due to medical issues in a students' household. Parents who decided to utilize this option were told that their children would receive "the same quality education as in a face-to-face setting," including "high quality course materials," and daily meetings with teachers over "web conferencing technology."

42.    On July 15, 2020, Citron Research published a report projecting that K12 shares would reach $100 based on K12's opportunity to capitalize on the global pandemic, which Citron Research called the "the ultimate tailwind" for the Company.  Notably, Citron Research's report  quoted several of Defendant Davis' statements during the April Earnings Call, where he concluded that K12 was the

company best positioned to take advantage of the spike in demand for online education.   Other analysts likewise cited Defendant Davis' comments and uniformly revised K12 price target upward or recommended that investors buy K12's stock.

43.     On August 11, 2020, K12 issued a press release announcing its financial results for the fourth fiscal quarter and full fiscal year ended June 30, 2020.  In it, Defendant Davis highlighted the purportedly smooth operations of K12's platform, stating "[t]he schools we support did not experience disruption, and we are thankful to have graduated more than 8,000 students this year[.]" Further, Defendant Davis assured the market of K12's preparedness for increased enrollment in the upcoming school year, stating:

> Managed public school enrollments are already 150 thousand, as of August 7th, and we are entering what has historically been the busiest part of our enrollment season. **We are therefore positioned to deliver double-digit growth in both revenue and adjusted operating income in the coming year.** This is only an early estimate and not formal guidance.

44.     On the same day, August 11, 2020, the Company held an Earnings Call to discuss the Company's financial results and operations.   During the Earnings Call, Defendant Davis bragged about K12's contract with one of nation's largest public schools, Miami-Dade County Public Schools, reiterating K12's readiness to service and administer online learning programs for large public school systems, remarking as follows:

> K12 will provide customized services [to Miami-Dade County Public Schools] including curriculum, assessment tools, teacher training and data management. **This will ensure a strong start to the new year for both educators and Miami-Dade's more than 270,000 students that we'll serve.**
>
> **Teachers already employed by Miami-Dade will combine their great teaching with our technology and expertise by high quality inspection and a safe environment.** This allows Miami-Dade to retain both teacher jobs and the all-important existing student teacher relationship. An alignment with their existing learning goals, Miami-Dade Public school teachers and administrators can also customize the online curriculum we'll provide including core subjects and hundreds of lessons. **This shows the flexibility of the K12 technical platform.**

> We're thrilled to support Superintendent Carvalho and the innovative solutions he and his team have designed. **This is just one example of how a large school district can rise to meet the unprecedented challenges, school closures caused by the COVID-19 pandemic.** We'll work with another school districts on their own customized solutions for the fall as well. **And we stand ready to support schools and school districts of any size during this critical time.**

45.     Defendant Davis closed his prepared remarks by stating that "[K12 is] in the right market at the right time with the right experience and technology to take advantage of a large addressable market."   Further, in response to an analyst's question regarding teacher hiring and training, Defendant Davis stated:

> [O]ur program has a standard set of training that we've honed over many years, and it only takes them about two weeks to go through the training. . . . What they need to know is what's the beginning of the content in the program. And as the students are learning throughout the year, the teachers are also getting more and more familiar with it. **So we've got professional development sessions for all the new teachers to get them through their first couple of weeks of training and then we will continue that development all throughout the year.**

46.     Defendant Medina added that "[K12's] core business and our growing Career Learning business put us in a strong position going into fiscal 2021.  **We are making investments now to ensure that we can serve all the families who choose to attend a K12-powered school.**"

47.     Stock analysts reacted positively to the Individual Defendants' statements on the Earnings Call. For example, William Blair analyst Stephen Sheldon, an analyst who participated in the Earnings Call reiterated an "Outperform" rating on K12, noting that K12 "[m]anagement spoke very positively about enrollment trends heading into fiscal 2021[.]"

48.     On August 12, 2020, K12 filed its Annual Report on SEC Form 10-K for the fiscal year ended June 30, 2020 ("2020 Annual Report").  There, K12 described itself as "an innovator in K-12 online education" with purportedly "distinctive core competencies that allow us to meet the varied needs of our school customers and students[, including] our ability to create engaging curriculum, train teachers in effective online instruction, [and] provide administrative support services to online schools . . . ."

49.     As to K12's readiness to service Managed Public School Programs, which comprise nearly 90% of K12's revenue, the 2020 Annual Report gave assurances of support provided by K12 to public schools:

> These programs offer an integrated package of systems, services, products, and professional expertise that we administer to support an online or blended public school, including: administrative support (e.g., budget proposals, financial reporting, student data reporting, and staff recruitment), information technology and provisioning, academic support services, curriculum, learning systems, and instructional services.

50.     The 2020 Annual Report further emphasizes K12's technological expertise, stating that their "areas of focus" include, among other things, "***making sure that all of our systems and solutions are easy for teachers, administrators, students, and parents to use***" and providing a "virtual learning platform which supports the scheduling and delivery of instruction, tracking of attendance, recording of instructional sessions, and allows student group work."  Similarly, K12's "Educational Philosophy" confirms that "students learn better not just with great curriculum, ***but also great teachers and technology that allows them to access the content and teachers*** in a way that makes learning more engaging and effective."

51.     Critically, the Company affirmatively represented the cybersecurity policies, protocols, and internal controls it purportedly had in place, including firewall technology, and encryption methods to safeguard against data breaches, stating as follows:

> *Cybersecurity.* Our cybersecurity measures and policies include dividing application layers into multiple zones controlled by firewall technology. Sensitive communications are encrypted between client and server and our server-to-server accessibility is strictly controlled and monitored. We have contracted with an outside network and information cybersecurity firm to assist us with monitoring traffic and potential threats that may target our services and systems. ***We protect sensitive information through policy and control governance that is validated on a semi-annual basis, and maintain a layered security architecture. Third-party firms are engaged to test our networks, servers and applications for vulnerabilities.*** We have prepared an incident response plan that is designed to escalate information regarding material data breaches and cybersecurity attacks to the senior management of the Company. A business-centric information security program has also been adopted that is tailored to adjust to an

ever-changing IT compliance and information security threat landscape. Although distributed denial-of-service attacks are frequently attempted, we have not experienced a significant disruption to our business as a result of these attacks.

52.     Unfortunately for the investing public, K12's risk disclosures contained only minimalistic boilerplate statements, which merely communicated the possibility that K12's systems could experience cybersecurity attack or breach, by certain "more sophisticated" hackers.  These same purported risk disclosures where accompanied by additional assurances regarding the safety of K12's systems and databases, including affirmative statements that "***K12 dedicate[s] personnel and resources to maintain multiple levels of protection to minimize the risk of a cybersecurity attack, malware intrusion or breach.***"

53.     Appended as Exhibits 32.1 and 32.2 to the 2020 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that "the [Annual Report] fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934," and that "the information contained in the [Annual Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

54.     As a result of Defendants' false and misleading statement, the price of K12 securities skyrocketed to its all times high of $51.60 on August 5, 2020, representing a 106% surge since the beginning of the Class Period.

55.     The above statements identified in ¶¶ 30 - 53 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) K12 lacked the technological capabilities, infrastructures, and expertise to support the increased demand for virtual and blended education necessitated by the global pandemic; (ii) K12 lacked adequate cyberattack protocols and protections to prevent the disabling of its computer system;

16

(iii) K12 was unable provide the necessary levels of administrative support and training to teachers, students, and parents; and (iv) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's business, operations, and prospects and/or lacked a reasonable basis and omitted facts.

### The Truth Begins to Emerge

56.     On August 26, 2020 — two weeks after K12 and the Individual Defendants made unsubstantiated claims about K12's readiness to service and support the public school system of Miami-Dade County—reports began to surface that teachers in the Miami-Dade County school system were extremely unprepared for the new school year because they were unfamiliar with K12's learning platform, and lacked "hands-on experience" and "adequate training for [K12's online learning platform]." The United Teachers of Dade President Karla Hernandez-Mats ("UTD President Hernandez-Mats") issued a statement, in which she disclosed that the "***the training for K12 has been ineffective and the time allotted to learn it has been unacceptable.***"

57.     On this news, the price of K12 common shares fell 7% over the course of two trading days, to close at $37.70 on August 27, 2020, on unusually high volume.

58.     On August 31, 2020—the first day of the school year—K12's online platform experienced major technical issues and disruptions that prevented students and teachers from successfully logging into the platform and utilizing its contents. Instead of seeing the educational curriculum and starting the new school year, users of the K12 platform received an error message, informing them that "[t]oo many people are online right now." UTD President Hernandez-Mats squarely put the blame on K12. UTD President Hernandez-Mats issued a formal statement in which she publicly scolded K12 for failing the entire school system, including education professionals, students, and parents, stating that K12's platform was "***not ready***" and that the Company was "***in over their head.***"

59.     By the third day of classes, September 2, 2020, Miami-Dade County public school students and teachers reported numerous technical issues and a total of twelve intermittent cyberattacks that hindered educational efforts.  Alarmingly, one of the cyber-attacks was committed by a 16-year-old high school junior who managed to disable the school's network system on which K12 was critically dependent for the provision of its service.  The 16-years-old student admitted to breaching the network by using a simple tool that industry experts described as a "decade-old, open source tool that most bare-bones firewall software can catch." For example, Barrett Lyon, the CEO of cybersecurity firm Netography, noted that the tool required no hacking experience and was the "modern-day equivalent" of pulling the fire alarm.

60.     K12 knew that it was dependent on the proper functioning of the Miami-Dade County School District's network, yet took no steps to secure its network, or to maintain meaningful alternatives that would have enabled K12 to continue to provide its services via alternative means or otherwise mitigate the potential risk of its service being disabled.  The breach of Miami-Dade County School District's network thereby exposed K12's inadequate and insufficient protocols relating to cybersecurity threats and the lack of mitigation measures to ensure the proper functioning of its own systems.

61.     These perpetual technical problems, and issues with connectivity and audio and video use, triggered an overwhelming amount of complaints from teachers, students, and parents to the officials of Miami-Dade County School District.  In response to the outrage from families and students unable to access and utilize the educational curriculum, the Miami-Dade County School Board called a Board meeting to discuss the many failures of the K12 online platform.  During the Board meeting, Miami-Dade County Public Schools Superintendent Alberto Carvalho revealed that he never signed the $15.3 million no-bid contract with K12 and the school district never paid K12 for the provision of its services and products.  During the same Board meeting, officials revealed that K12 admitted

that its problems were not limited to Miami-Dade County, and instead, K12 "had some sporadic issues with other schools."

62.     On this news, the price of K12 common shares sharply fell by 10.5% over the course of two trading days, to close at $34.89 on September 3, 2020. The Company's stock price has continued to decline.

63.     Unfortunately for the students and teachers in Miami-Dade County, the numerous issues with K12 continued into the second week of classes.  Miami-Dade County students reported that teachers and students could not see or hear each other and could not access the educational curriculums.  Furthermore, many students reported that the content had been deleted while users were booted from the program, leading some students to be falsely marked as absent.  The number of cyberattacks during the first week grew to at least twenty-five.

64.     On September 9, 2020, in response to the ongoing issues with the K12 platform, the Miami-Dade County School Board called a Board meeting, which lasted 13 hours and featured 400 public speakers.  Parent complaints about K12 were wide-ranging, including: (1) curriculum that was not age-appropriate; (2) references to materials that the District had not purchased which made the existing materials "useless;" (3) lack of support for students with special needs; (4) insufficient training and time to prepare; and (5) an unreliable system. Consistent with the parents' complaints, teachers referred to the K12 curriculum as "sub-par."  In a letter to the Miami-Dade County School Board, Defendant Davis acknowledged that "[t]he platform … needed more work and clearly did not handle Miami-Dade's requirements."  The Miami-Dade County School Board meeting culminated in the Board's vote on September 10, 2020, to stop using K12's online learning platform.

65.      On this news, the price of K12 common shares plummeted further by 11.5% to close at $30.55 on September 10, 2020, on unusually high trading volume.

66.     K12's problems were not limited to Miami-Dade County. On September 15, 2020,

within a week of the start of classes, the Beaufort County School Board began to consider the cancellation of its own $2.75 million contract with K12. In making a motion to terminate the contract, Board member John Dowling ("Dowling") stated that "the senior staff has lost any confidence at all" in K12. A district spokesperson also disclosed that the district had not yet made any payments to K12 pursuant to the contract.

67.     On September 17, 2020, after the Beaufort County School Board discussed the contract in an executive session, Dowling moved to terminate the K12 contract, "recognizing the fact that contractual obligations were not met." The Board voted unanimously to terminate the K12 contract. In a statement after the vote, Superintendent Frank Rodriguez cited his disappointment in K12's ability to meet the Board's expectations and fulfill its requirements under the contract.

68.     On this news, the price of K12 common shares sharply fell by 4.9%, to close at $27.21, on September 18, 2020.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on its own behalf and as representative of a Class, consisting of all those who purchased or otherwise acquired K12 shares during the Class Period ("Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

70.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, K12 shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in

the proposed Class.  Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

71.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages from the same wrongful conduct of Defendants. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

72.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

73.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether statements made by K12 and the Individual Defendants to investors during the Class Period included misrepresentations of material facts about the data security condition, operations and oversight at K12;

- whether K12 and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether K12's and the Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of K12 shares during the Class Period were artificially inflated due to K12's and the Individual Defendants' conduct described herein;

- injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

74.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

75.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for K12 and the Individual Defendants.

76.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD ON THE MARKET DOCTRINE

77.    The market for K12 shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, K12's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of K12 shares and market information provided by and relating to K12, and have been damaged thereby.

78.    During the Class Period, the artificial inflation of K12's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about

K12's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of K12's financials and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the K12 shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing K12 shares at such artificially inflated prices, and each of them has been damaged as a result.

79.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- K12 and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiff and the Class;

- K12 shares were traded on the NYSE and were covered by numerous analysts;

- K12 shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the K12 shares; and

- Plaintiff and Class members purchased and/or sold K12 shares between the time K12 and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

80.     As a result of the foregoing, the market for K12 shares promptly digested current information regarding K12 from all publicly available sources and reflected such information in K12's share price. Under these circumstances, all purchasers of K12's shares during the Class Period suffered similar injury through their purchase of K12's shares at artificially inflated prices. Thus, a presumption of reliance applies.

81.     Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

82.     In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION

83.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Plaintiff and the Class would not have purchased shares of K12 stock if the Company had not made the misrepresentations alleged above or had not failed to provide the investing public the material adverse information alleged herein.

84.     During the Class Period, Plaintiffs and the Class purchased K12's shares at artificially inflated prices and were damaged thereby. The price of K12 shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

85.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Defendants, by virtue of their receipt of information reflecting the true facts regarding K12, their control over, and/or receipt and/or modification of K12's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning K12, participated in the fraudulent scheme alleged herein.

86.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Individual Defendants. By way of example, Defendants acted intentionally and recklessly when they touted K12's contract with Miami-Dade County Public Schools, one of the largest school systems in the Country, when no such contract was ever signed by the Miami-Dade County Public School System. Defendants knew no contract was signed by Miami-Dade County Public Schools. Similarly, Defendants acted intentionally and recklessly in touting the quality and effectiveness of the Company's cybersecurity capabilities, including firewall protection and encryption methods to protect against breaches, disablement and privacy invasions. These promises of security were false.  Even a 16-years old high school student who breached the school's network disabled K12's ability to continue to operate and function.  Defendants knew these statements were false or acted with reckless disregard as to their truth or falsity.

87.     The Individual Defendants, because of their positions with K12, made and/or controlled the contents of the Company's public statements during the Class Period. Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause

them to be corrected. Because of their positions and access to material non-public information, Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were materially false and misleading. As a result, each of these Defendants is responsible for the accuracy of K12's corporate statements and are therefore responsible and liable for the representations contained therein.

88.     Additionally, according to public sources, during June and July 2020, Defendant Davis, the Company's CEO and Chairman of the Board of K12, divested 132,800 shares of K12 for a total proceeds of nearly **$4 million,** which represented more than one-fifth of his entire personal holdings of K12.

## NO SAFE HARBOR

89.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, K12 and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of K12 who knew that those statements were false and misleading when made.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder) Against All Defendants

90.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

91.     During the Class Period, K12 and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew to be false or deliberately disregarded whether they were in fact true or false in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

92.     K12 and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with purchases of K12 shares during the Class Period.

93.     K12 and the Individual Defendants acted with scienter because they knew that the statements issued in the name of K12 were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws. K12 and the Individual Defendants, through receipt of information reflecting true facts about K12, their control over, and/or receipt of or modification to K12's allegedly materially misleading statements, which made them aware of K12's confidential proprietary information, participated in the fraudulent scheme complained of herein.

94.     The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by K12, and intended to deceive Plaintiff and Class members,

or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other K12 employees to investors, including Plaintiff and Class members. These misrepresentations and omissions were material.  A reasonable investor would consider the facts--such as a lack of a contract with a large customer like Miami-Dade County Public Schools-- important in deciding whether to buy shares of K12 stock and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material omitted facts.

95.     Pursuant to the foregoing, the price of K12 shares were artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by K12 and the Individual Defendants, Plaintiff and Class members relied on the statements made by K12 and the Individual Defendants and/or the integrity of the market price of K12 shares during the Class Period in purchasing K12 shares at prices that were artificially inflated due to false and misleading statements made by K12 and the Individual Defendants.

96.     Were Plaintiff and Class members made aware that the market price of K12 shares were artificially and falsely inflated by misleading statements made by K12 and the Individual Defendants, and by material adverse information that K12 and the Individual Defendants failed to disclose, they would not have purchased K12 shares at artificially inflated prices, or purchased them at any price.

97.     Based on the wrongful conducted alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

98.     K12 and the Individual Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of K12 shares during the Class Period.

## SECOND CLAIM FOR RELIEF

**(Violation of Section 20(a) of the Exchange Act)**
**Against the Individual Defendants**

99.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

100.    During the Class Period, the Individual Defendants were involved in the management and operation of K12's business affairs. Due to their senior positions, they had knowledge of adverse non-public information regarding K12's lack of data security and vulnerabilities of the platform and the lack of adequate training for students, teachers, and parents.

101.    As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding K12's financial condition and results of operations, and to correct any public statements issued by K12 which were materially false or misleading.

102.    Due to their positions of authority at K12, the Individual Defendants controlled the contents of various public filings, press releases and reports which K12 disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause K12 to execute the wrongful acts alleged herein. the Individual Defendants were therefore "controlling persons" at K12 pursuant to Section 20(a) of the Exchange Act. On this basis, they were participants in the unlawful conduct alleged which caused the prices of K12 shares to be artificially inflated.

103.    Based on the conduct described above, the Individual Defendants are liable for the violations committed by K12 pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands relief as follows:

A.     Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of

Civil Procedure, certifying Plaintiff as Class Representative;

  B.  Awarding damages in favor of Plaintiff and members of the Class against K12 and the Individual Defendants, jointly and severally, for all damages sustained as a result of K12's wrongdoing, in an amount to be proven at trial;

  C.  Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

  D.  Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

  E.  Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated November 19, 2020

        **Gregory S. Duncan, Esquire**

        */s/ Gregory S. Duncan*
        Gregory S. Duncan (VSB No. 26692)
        222 Court Square
        Charlottesville, Virginia 22902
        Telephone: (434)979-8556
        Email: gregdun@ntelos.net

        *Local Counsel for Plaintiff*

        Andrea Farah (*pro hac vice* forthcoming)
        Christian Levis (*pro hac vice* forthcoming)
        **LOWEY DANNENBERG, P.C.**
        44 South Broadway, Suite 1100
        White Plains, New York 10601
        Telephone: 914-997-0500
        Email: afarah@lowey.com
          clevis@lowey.com

        *Counsel for Plaintiff*

SWORN CERTIFICATION OF PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Yun Chau Lee, certify that:

1. I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2. I am duly authorized to institute legal action against K12 Inc. and other defendants.

3. I did not purchase K12 Inc., securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

4. I am willing to serve as a representative party(s) on behalf of a class and will testify at deposition and trial, if necessary.

5. My transactions in K12 Inc.'s, securities during the Class Period are set forth below.

6. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years.

7. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

November 10 , 2020
Date

Yun Chau Lee

Yun Chau Lee's Transactions in K12 Inc.'s securities:

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 07/16/2020 | Buy | 5,000 | $45.00 |