**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

|  |  |
|---|---|
| **IN RE K12 INC. SECURITIES LITIGATION** | No. 1:20-cv-01419-LO-TCB |
| **THIS DOCUMENT RELATES TO:** | **CLASS ACTION** |
| **The Consolidated Action** | **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |
|  | **JURY TRIAL DEMANDED** |

Lead Plaintiff James Boykin and Named Plaintiffs Adnan Saeed and Chan-Hee Koh (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned counsel, hereby bring this Consolidated Amended Class Action Complaint for Violation of Federal Securities Laws ("Complaint") against K12 Inc. ("K12" or the "Company"); Nathaniel A. Davis, K12's Chief Executive Officer ("Davis"); and Timothy Medina, K12's Chief Financial Officer ("Medina", and collectively with K12 and Davis, "Defendants"), based upon, *inter alia*, the investigation conducted by and under the supervision of Plaintiffs' counsel, which included a review of the Company's public documents, earnings call transcripts, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and readily obtainable information. Plaintiffs' counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION[1]

1.      This is a federal securities class action on behalf of all persons and entities, other than Defendants, that purchased or otherwise acquired K12 securities between April 27, 2020 and September 18, 2020, both dates inclusive (the "Class Period").  Plaintiffs seek to recover damages caused by Defendants' violation of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company, its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO").

2.      K12, now known as Stride, Inc., is a Delaware company headquartered in Herndon, Virginia.[2]  K12 is a technology-based education company that provides proprietary and third-party educational curriculum, teacher training, administrative support, information technology support, software systems and educational services.  The Company operates virtual learning systems worldwide.  As a provider of online content and educational services, K12's success and financial and operational well-being is critically dependent on its technical capability and ability to provide and maintain well-functioning and operational information technology systems and infrastructures.

3.      Beginning in March 2020, the global pandemic forced school districts across the country to close in-class instruction and shift all learning activities to online and blended instruction.  K12, which had a history of reporting disappointing financial results during the 10-month period prior to the school closures, saw a unique opportunity to revamp itself by seizing a large stake in the rapidly growing market for online education. Almost immediately following the

---

[1] Unless otherwise stated, all emphasis is added.
[2] Effective December 16, 2020, the Company changed its legal name from K12 Inc. to Stride, Inc.

nationwide closure of in-class instruction, K12 embarked on an intensive campaign to convince the market that it was well positioned and technologically capable to accommodate and service the massive surge of students, parents, and teachers who were turning to online education.  To do that, Defendants disseminated numerous false and misleading statements in which they touted (i) the technological wherewithal of the Company's online learning platforms and preparedness for large volumes of students, (ii) cybersecurity protocols and protections, and (iii) the training that K12 would provide to students, parents, and teachers.

4.      K-12's self-promoting campaign worked well.  In reliance on K12's false and misleading statements, the investing community expected K12 to experience a great boost in its financials and successfully capitalize on the opportunities presented to it by the global pandemic. For example, on July 15, 2020, when K12 common shares traded at around $43 per share, Citron Research published a $100 price target for K12.  Citron Research's prediction was based on its belief that K12 was "best positioned to take advantage of [the] megatrend [of shifting to full online education]."  Similarly, securities analysts gradually increased K12's rating, based on the Company's executives' commentary.  As a result of K12's self-promoting campaign, the price of K12 shares skyrocketed to its all-time high closing price of $51.60 per share on August 5, 2020, a surge that was unmatched by any of K12's competitors.

5.      In reality, however, and unbeknownst to the investing public, K12 was not ready to take on the increased load and lacked the technological capabilities to support and service the massive increase in traffic on its website and its learning platforms.  Indeed, K12 lacked adequate infrastructures to enable thousands of students and teachers to logon to their systems and utilize the audio and video features necessary for remote instruction.  Additionally, despite K12's representations to the contrary, its cybersecurity measures and protocols were so weak that a 16-

year-old high school junior successfully breached the network on which K12 was critically dependent, and thereby crippled K12's online platform and the provision of its services for hundreds of thousands of students for several days.  The issues relating to the functionality and support of K12's platforms were only compounded by the ineffective training and instruction provided to teachers and parents, who received little support and insufficient hands-on experience and training prior to the platform's launch.

6.      Contrary to the facts asserted by K12, reports began to surface that K12's training for teachers in the Miami-Dade County Public Schools, the fourth largest school district in the United States, had been woefully inadequate.  For example, according to a Miami Herald article published on August 25, 2020, post-market, and updated on August 26, 2020, Dr. Steve Gallon, III, Vice Chair of the Miami-Dade County Public School Board, disclosed that **"[b]ased on the many concerns I have received, it appears that several areas of planning and execution relative to training and new system fell below the expectations we set as a Board and for which employees and parents look forward to."**  Additionally, CBS Miami published an article on August 26, 2020, post-market, that included a statement issued by United Teachers of Dade President Karla Hernandez-Mats, that the "**the training for K12 has been ineffective….**"

7.      On this news, the price of K12 common shares sharply fell almost 14% over the course of two trading days, to close at $37.70 per share on August 27, 2020, on unusually high volume.

8.      On September 2, 2020, the third day of classes, the Miami Herald published an article that revealed that Miami-Dade County students and teachers reported **numerous technical issues and a total of twelve intermittent cyberattacks that led to K12's learning platform effectively being dysfunctional**.  In response to the overwhelming amount of complaints by

4

outraged parents, Miami-Dade County Public Schools called a Board meeting on September 2, 2020 to discuss K12's many failures.  Although investors had previously been led to believe that the Company had a signed contract with the Miami-Dade County Public Schools, the September 2, 2020 Miami Herald article revealed that, at the Board meeting, it was disclosed that *Superintendent Alberto Carvalho never signed the $15.3 million no-bid contract with K12, and the school district had never paid K12 for the provision of its services and products*.

9.      On this news, the price of K12 common shares fell by 3.3%, to close at $37.55 per share on September 2, 2020.

10.     A Miami Herald article published on September 3, 2020, further exposed the extent of K12's inadequate and insufficient protocols relating to cybersecurity threats and the lack of mitigation measures to ensure the proper functioning of its own systems. The article revealed that one of the cyber-attacks *was committed by a 16-year-old high school junior who managed to disable the school's network system* on which K12 was critically dependent for the provision of its services.  Barrett Lyon, CEO of cybersecurity firm Netography, noted that *the tool used by the 16-year old student was the "modern-day equivalent" of pulling the fire alarm*.  The article also stated that Mark Rasch, a cybersecurity expert and former federal cybercrimes prosecutor, commented:  *"It's a point-and-click program. You don't have to have a great degree of sophistication to launch [a cyberattack.]"*

11.     On this news, the price of K12 common shares fell by almost 7.1%, to close at $34.89 on September 3, 2020.

12.     A week later, after another Miami-Dade County Public School Board meeting that lasted for over 13 hours and included 400 speakers, the Miami-Herald published an article on

September 10, 2020, premarket, stating that **the Board voted on September 10, 2020 to terminate the $15.3 million contract with K12**.

13.     On this news, the price of K12 common shares again fell by 9.5%, to close at $30.55 per share on September 10, 2020, on unusually high trading volume.

14.     K12's problems were not limited to Miami-Dade County.  On September 15, 2020, within a week of the start of classes, **the Beaufort County School Board began to consider the cancellation of its own $2.75 million contract with K12.**  According to an article published by The Island Packet on September 15, 2020, post-market, and updated on September 16, 2020, in making a motion to terminate the contract on September 15, 2020, Board member John Dowling stated that **"the senior staff has lost any confidence at all" in K12**; and a district spokesperson also stated that the district had not yet made any payments to K12 pursuant to the contract.

15.     On this news, the price of K12 common shares fell by 4.2%, to close at $29.62 on September 16, 2020.

16.     According to a September 17, 2020 article published by The Island Packet, on September 17, 2020, after the Beaufort County School Board discussed the contract in an executive session, Dowling moved to "accept the Superintendent's recommendation" to terminate the K12 contract, "recognizing the fact that contractual obligations were not met."  **The Board voted to terminate the K12 contract**.  In a statement after the vote, Superintendent Frank Rodriguez cited his disappointment in K12's ability to meet the Board's expectations.

17.     Additionally, on September 17, 2020, the Miami Herald published an article disclosing that **the Office of Inspector General for Miami-Dade County Public School was investigating Miami-Dade County Public Schools Superintendent Alberto Carvalho's non-profit foundation regarding a solicited donation from K12 of $1.57 million**.

18.     On this news, the price of K12 common shares fell 4.5%, to close at $28.30, on September 17, 2020.

19.     Throughout the Class Period, Defendants made materially false and misleading statements about the Company's business and operations.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose to investors that: (i) the Company did not have a signed contract with the Miami-Dade County Public Schools; (ii) K12 lacked the technological capabilities, infrastructures, and expertise to support the increased demand for virtual and blended education necessitated by the global pandemic; (iii) K12 lacked adequate cybersecurity protocols and protections to prevent and mitigate cyberattacks; and (iv) K12 was unable to provide the necessary levels of training to teachers, students, and parents.

20.     As a result of the Defendants' wrongful acts and omissions, and the precipitous decline in the market value of K12's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

23.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this Judicial District.  Pursuant to K12's most recent annual report on Form 10-K for the fiscal year ended June 30, 2020, there were 41,309,402 shares of the Company's common stock outstanding as of July 31, 2020.  K12's

common stock trades on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in K12's common stock located within the U.S., some of whom undoubtedly reside in this Judicial District.

24.     In connection with the acts alleged in this Complaint, K12, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

## PARTIES

25.     Plaintiffs, as set forth in the previously filed certification for Lead Plaintiff James Boykin,[3] incorporated by reference herein, and the attached certifications for Named Plaintiffs Adnan Saeed and Chan-Hee Koh, acquired K12 securities during the Class Period, at artificially inflated prices, and were damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26.     Defendant K12 is a Delaware corporation with a principal place of business at 2300 Corporate Park Drive, Herndon, Virginia 20171.  K12 shares trade on the NYSE under the ticker symbol "LRN."

27.     Defendant Davis served as the Company's CEO from February 2018 until January 2021 and as Chairman since June 2012.

28.     Defendant Medina has served as the Company's CFO since his appointment in April 2020.

29.     Defendants Davis and Medina are sometimes referred to herein as the "Individual Defendants."

---

[3] Dkt. No. 14-3.

30.    The Individual Defendants possessed the authority to control the contents of statements made by K12 in the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e*., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with K12, and access to K12's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors.  The Individual Defendants are liable for the false and misleading statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Background

31.    K12 is a technology-based education company that provides proprietary and third-party educational curriculum, software systems and educational services designed to facilitate individualized learning for students, the majority of which are in kindergarten through 12th grade, or K-12.  The Company primarily targets virtual and blended public schools, school districts, charter schools, and private schools that utilize varying degrees of online and traditional classroom instruction, and other educational applications.

32.    The Company's core business is providing products and services to three lines of business – (i) ***Managed Public School Programs***, which are programs which offer an integrated package of systems, services, products and professional expertise that K12 administers to support an online or blended public school, including administrative support, information technology and provisioning, academic support services, curriculum, learning systems, and instructional services; (ii) ***Institutional***, which are non-managed public school programs which provide instruction,

curriculum, supplemental courses, marketing, enrollment and other educational services; and (iii) *Private Pay Schools and Other*, which are private schools for which the Company charges student tuition and makes direct consumer sales.

### A. The Company is No Stranger to Allegations of Making False Statements and Failing to Disclose

33.     According to a December 18, 2014 Probes Reporter Report, *the Company was the subject of an undisclosed formal SEC investigation in 2012-13.*  In a Formal Order of Investigation sent to the Company in January 2012, the SEC stated: "The Commission has information that tends to show that from at least January 1, 2011[, the Company,] [i]n possible violation of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, . . . *may have been or may be . . . making false statements of material fact or failing to disclose material facts concerning, among other things, the academic effectiveness of K12's online public kindergarten through 12th grade school management systems."*

34.     On July 8, 2016, then-California Attorney General, Kamala Harris, announced a $168.5 million settlement with K12 over *alleged violations of California's false claims, false advertising and unfair competition laws*.  Harris stated: "K12 and its schools *misled parents and the State of California by claiming taxpayer dollars for questionable student attendance, misstating student success and parent satisfaction*, and loading nonprofit charities with debt…. [T]his settlement ensures K12 and its schools are held accountable and make much-needed improvements."

35.     The California Attorney General's Office ("AG's Office") alleged that K12 misled parents by publishing misleading advertisements about students' academic progress, parent satisfaction, its graduates' eligibility for University of California ("UC") and California State University ("CSU") admission, class sizes, the individualized and flexible nature of K12's

instruction, the quality of the materials provided to students, and hidden costs.  Additionally, the AG's office alleged that K12 submitted inflated student attendance numbers and influenced non-profit online charter schools to enter into unfavorable contracts that put them in a deep financial hole.

36.     On July 20, 2016, the Company was also the subject of a federal securities fraud action filed in the Northern District of California, which, like the AG's Office, alleged that K12 was publishing false and/or misleading advertisements about students' academic progress, parent satisfaction, student eligibility for UC and CSU, class sizes, the individualized and flexible nature of K12's instruction, the quality of the materials provided to students, and hidden costs.  In 2019, the suit settled for $3.5 million.

37.     Since April 2019, the Company experienced a steady decline in the price of its common shares caused by disappointing performance metrics, including reporting significantly higher net losses than expected and decreasing net income.  In fact, between April 2019 and February 2020, the price of K12 common shares declined from approximately $37 per share on April 16, 2019 to $15.86 per share on February 10, 2020, a decline of more than 57% over the course of ten months.

**B.     K12's Aggressive Self-Promoting Campaign Inflates the Price of K12 Shares**

38.     While the COVID-19 pandemic ravaged many industries, K12's prospects seemingly began to improve because of the overall shift to blended and remote learning.  Around March 2020, nearly all elementary and high schools nation-wide shifted to virtual operation.  Online learning providers, like K12, saw a boom as parents and educators sought an alternative to the traditional classroom setting.  K12 was presented with a unique opportunity to leave its struggles in the past and revamp itself into the nation's leading provider of online curriculum and

other educational services.  In its effort to seize the market prior to the opening of the new school year in September 2020, Defendants embarked on an intensive campaign to convince investors of its preparedness and technical wherewithal to service the unprecedented surge of online students.

39.     In an April 27, 2020 earnings call (the "April 27 Earnings Call"), Defendant Davis stated that "the biggest opportunity for [K12]" was in providing schools unable to open due to the pandemic with the capabilities to run virtually.  Davis touted the Company's financial results, which, according to him, were the result of the **_ongoing strength of [K12's] core business[.]_** As to K12's technical abilities, Defendant Davis assured investors that, notwithstanding the pandemic's disruption of academic plans and goals for so many students, **_for most users of K12 powered programs, "the academic experience . . . was essentially school as usual."_**

40.     During the April 27 Earnings Call, Defendant Davis also stated: "Let's talk about the upsides of the pandemic . . . it's horribly unfortunate for so many people all around the world. **_But we're in the business that helps schools and students in situations exactly like this._** When the pandemic first started to impact brick and mortar schools, **_our phones begin to ring off the hook…._**" When asked about the time it takes to establish a new school with K12's system, Davis said that COVID-19 was "**_a positive tailwind_**" that is putting the onus on the school system, stating that "states come to us and say, hey, can we do something here?"  He went even further, professing that online school programs are the way forward if schools "want to be in a position to be able to help students and help your community and help your state." **_To this end, Defendant Davis made investors aware of ongoing negotiations and K12's bidding process with a "couple of very large school districts" and "two large cities."_**

41.     The following day, April 28, 2020, Barrington Research issued an analyst report which indicated that K12's recent positive stock performance was driven by the fact that "investors

have been drawn to its robust distance learning model and see potential upside from COVID fears driving demand for its services. . . ." That same day, analyst BMO Capital Markets quoted Defendant Medina's statement from the Company's April 27 Earnings Call in stating: "Over the long term, management believes growth can accelerate as the awareness and acceptance of online education improves post-crisis, as COVID-19 becomes a 'lasting tailwind.'" BMO Capital Markets reiterated this on June 4, 2020, following a meeting with K12 management, and stated: "We have greater conviction that the COVID-19 pandemic, while horrific, has increased the appreciation for and acceptance of online learning and that [K12], as one of the industry leaders, should benefit." BMO Capital Markets again reiterated K12's strong upside in light of the pandemic in a July 16, 2020 report, predicting growth in the fall.

42.    On July 14, 2020, Citron Research published a report projecting that K12 shares would reach $100 based on K12's opportunity to capitalize on the global pandemic, which Citron Research called the "the ultimate tailwind" for the Company.  Notably, Citron Research's report quoted several of Defendant Davis' statements from the April 27 Earnings Call, where he concluded that K12 was the company best positioned to take advantage of the spike in demand for online education.  Other analysts likewise cited Defendant Davis' comments and uniformly revised K12's price target upward or recommended that investors buy K12's stock. An August 7, 2020 article on The Motley Fool stated that K12 stock was up 68% in July because of Citron Research's positive outlook and due to comments from Defendant Davis, such as from the April 27 Earnings Call with analysts in which he stated, "When the pandemic first started to impact brick-and-mortar schools, our phones began to ring off the hook."

43.    On August 11, 2020, the Company held another earnings call (the "August 11 Earnings Call").  During this earning call, **_Defendant Davis misled investors to believe that K12 had a signed contract with the Miami-Dade County Public Schools_**.  Defendant Davis stated:

> As for school districts, more and more of them now plan to use online learning as an alternative to in-person classes. **_One such school district is Miami-Dade County Public Schools_**, a district we've had a relationship for more than a decade.
>
> With Superintendent Carvalho and his staff's guidance, K12 will provide customized services, including curriculum, assessment tools, teacher training and data management. This will ensure a strong start to the new year for both educators and Miami-Dade's more than 270,000 students that we'll serve. The teachers already employed by Miami-Dade will combine their great teaching with our technology and expertise to provide high-quality instruction in a safe environment. This allows Miami-Dade to retain both teacher jobs and the all-important existing student-teacher relationships.
>
> . . . We're thrilled to support Superintendent Carvalho and the innovative solution he and his team has designed.  This is just one example of how a large school district can rise to meet the unprecedented challenges of school closures caused by the COVID-19….
>
> ***
>
> We are seeing increase, however, in school districts who call us and want to use our content and our curriculum with **_more of those contracts this year than we've ever had in any one year before. I mentioned Miami-Dade, there's others we're working on, not yet disclosed_**, but maybe not as large as Miami-Dade. I said they are 270,000 students. There are others that are literally anywhere from 10,000 to 100,000 students. So we're seeing more demand there as well.

44.    Stock analysts reacted positively to the statements on the August 11 Earnings Call. The following day, on August 12, 2020, a day after the August 11 Earnings Call that Barrington Research participated in and in which Davis touted the relationship with Miami-Dade County Public Schools, Barrington Research published an analyst report reiterating its OUTPERFORM rating and said:

> Because of the COVID-19 pandemic, management noted an increase in schools and districts inquiries regarding online options for its students. While some contracts are signed, some conversations are still ongoing but management said it expects this business will grow in FY/21, after three years of decline. **_One such district contract signed is Miami-Dade County Public School System, a district with which K12 has had a relationship for more_**

*than a decade. K12 will provide Miami-Dade customized services, including curriculum, assessment tools, teacher training and data management*, in order to ensure a strong start to the new school year for both educators and its more than 270,000 students.

45.     William Blair analyst, Stephen Sheldon, who also participated in the August 11 Earnings Call, published an analyst report on August 12 reiterating an "Outperform" rating and stated, in regard to management's confidence about the institutional business,

> K12 has seen significant inbound interest from school districts (including very large ones) looking for sets of tools to help them in their shift online (curriculum, assessments, teacher training, data management, etc.). *For example, K12 will be providing a variety of support/solutions to the Miami-Dade public school district starting this fall*, which supports over 270,000 K-12 students, and management noted that it is in current discussions with other sizable districts around the country. We have assumed the institutional business returns to high-single-digit growth in 2021, which would be conservative given demand trends. *We note that the institutional business is also higher margin, so any upside to revenue estimates in this business would have an even larger impact on profit.*

46.     William Blair analyst, Stephen Sheldon, reiterated an "Outperform" rating on K12 on August 21, 2020, and noted:

> *K12 announced a large contract win in [the institutional] business with the Miami-Dade school district (roughly 270,000 students) last week*, and management said that there are about 30-40 more deals in the pipeline…. In addition, if this business returns to solid growth next year (we have about 8% growth, which seems conservative against a very easy comparison), it could have an even bigger impact on profit given the higher margin-profile in the institutional business

47.     As a result of K12's aggressive public self-promoting campaign, K12's stock price reached an all-time high closing price during the pandemic, closing at $51.60 on August 5, 2020, *representing a 106% increase in the price of its shares since the beginning of the Class Period*. Unlike K12, its competitors fared worse, experiencing a more moderate increase in the price of their shares.  For example, Rosetta Stone experienced an approximately 71% increase while Pluralsight experienced a 40% increase.

**C.      K12 Misrepresented its Technological Capabilities, Infrastructures, and Expertise to Support Increased Demand and Failed to Disclose the Lack of Adequate Cyber Protections and Ineffective Training**

48.      Throughout the Class Period, K12 made false and misleading statements and failed to disclose that it (i) lacked the technological capabilities, infrastructures, and expertise to support the increased demand for virtual and blended education necessitated by the global pandemic, (ii) lacked adequate cybersecurity protocols and protections to prevent and mitigate cyberattacks, and (iii) was unable to provide the necessary levels of training to teachers, students, and parents.

49.      K12 touted the technological wherewithal of the Company's online learning platforms and preparedness for large volumes of students, its cybersecurity protocols, as well as the training that K12 would provide to students, parents, and teachers.

50.      K12 touted its relationship with the Miami-Dade County Public Schools in its August 11 Earnings Call with analysts, and stated it was contributing to growth.  Defendant Davis led investors to believe that K12 had a signed contract with the district.

51.      In reality, however, K12 did not have a signed contract with the Miami-Dade School District, and was not ready to take on the increased load and lacked the technological capabilities to support and service the massive increase in traffic on its website and its learning platforms.  Indeed, K12 lacked adequate infrastructures to enable thousands of students and teachers to logon to their systems and utilize the audio and video features necessary for remote instruction.  The issues relating to the functionality and support of K12's platforms were only compounded by the lack of training and instruction provided to teachers and parents, who received little support and insufficient hands-on experience and training prior to the platform's launch.

52.      Contrary to the facts asserted by K12, reports began to surface that teachers in the Miami-Dade County school system were extremely unprepared for the new school year because

they were unfamiliar with K12's learning platform.  On August 25, 2020, Dr. Steve Gallon, III, Vice Chair of the Miami-Dade County School Board, was quoted as saying that **"[b]ased on the many concerns I have received, it appears that several areas of planning and execution relative to training and new system fell below the expectations we set as a Board and for which employees and parents look forward to."**  Additionally, on August 26, 2020, it was reported that United Teachers of Dade President Karla Hernandez-Mats said, "***the training for K12 has been ineffective….***"

53.     On September 2, 2020, it was revealed that Miami-Dade County public school students and teachers reported **numerous technical issues and a total of twelve intermittent cyberattacks that hindered educational efforts.**  K12 knew that it was dependent on the proper functioning of the Miami-Dade County School District's network, yet took inadequate steps to secure its network, or to maintain meaningful alternatives that would have enabled K12 to continue to provide its services via alternative means or otherwise mitigate the potential risk of its service being disabled.  The breach of Miami-Dade County School District's network thereby exposed K12's inadequate and insufficient protocols relating to cybersecurity threats and the lack of mitigation measures to ensure the proper functioning of its own systems.  The perpetual technical problems, and issues with connectivity and audio and video use, triggered an overwhelming amount of complaints from teachers, students, and parents to the officials of Miami-Dade County School District.  In response to the outrage from families and students unable to access and utilize the educational curriculum, the Miami-Dade County School Board called a Board meeting on September 2, 2020 to discuss the many failures of the K12 online platform.  During the September 2, 2020 Board meeting, Miami-Dade County Public Schools CFO Ron Steiger revealed that

***Superintendent Alberto Carvalho never signed the $15.3 million no-bid contract with K12, and the school district never paid K12 for the provision of its services and products***.

54.     On September 3, 2020, reporting further exposed the extent of K12's inadequate and insufficient protocols relating to cybersecurity threats and the lack of mitigation measures to ensure the proper functioning of its own systems. One of the cyber-attacks ***was committed by a 16-year-old high school junior who managed to disable the school's network system*** on which K12 was critically dependent for the provision of its service.  Barrett Lyon, CEO of cybersecurity firm Netography, noted that ***the tool used by the 16-year old student was the "modern-day equivalent" of pulling the fire alarm***.  Mark Rasch, a cybersecurity expert and former federal cybercrimes prosecutor, stated: ***"It's a point-and-click program. You don't have to have a great degree of sophistication to launch [a cyberattack.]"***

55.     A week later, on September 9, 2020, in response to the ongoing issues with the K12 platform, the Miami-Dade County School Board called a Board meeting, which lasted thirteen hours and featured 400 public speakers.  Parent complaints about K12 were wide-ranging, including: (i) curriculum that was not age-appropriate; (ii) references to materials that the District had not purchased which made the existing materials "useless;" (iii) lack of support for students with special needs; (iv) insufficient training and time to prepare; and (v) an unreliable system. Consistent with the parents' complaints, teachers referred to the K12 curriculum as "sub-par." ***Dr. Marta Perez, a Miami-Dade Board member, spoke to Defendant Davis.   "During our conversation, [Defendant Davis] said three times this was not the fault of the administration. This was not the fault of Alberto Carvalho.  We take full responsibility."***  Defendant Davis sent a letter to the Board that acknowledged that "[t]he platform . . . needed more work and clearly did not handle Miami-Dade's requirements."   ***The Miami-Dade County School Board meeting***

*culminated in the Board's vote at 2:00 am on September 10, 2020, to stop using K12's online learning platform.*  An analyst report published by William Blair on September 10, 2020 also stated, "We believe this announcement [regarding K12's loss of the Miami-Dade contract] drove the weakness in shares today."

56.     K12's problems were not limited to Miami-Dade County.  On September 15, 2020, within a week of the start of classes, the Beaufort County School Board began to consider the cancellation of its own $2.75 million contract with K12. In making a motion to terminate the contract on September 15, 2020, School Board member John Dowling ("Dowling") stated that *"the senior staff has lost any confidence at all" in K12* and a district spokesperson also disclosed that the district had not yet made any payments to K12 pursuant to the contract. On September 17, 2020, after the Beaufort County School Board discussed the contract in an executive session, Dowling moved to "accept the Superintendent's recommendation" to terminate the K12 contract, "recognizing the fact that contractual obligations were not met."  *The School Board voted to terminate the K12 contract*.  In a statement after the vote, Superintendent Frank Rodriguez cited his disappointment in K12's ability to meet the Board's expectations.

57.     Additionally, *on September 17, 2020, it was revealed that the Office of the Inspector General for Miami-Dade County Public Schools was investigating Miami-Dade County Public Schools Superintendent Alberto Carvalho's nonprofit foundation regarding a solicited donation from K12 of $1.57 million.*

58.     On October 26, 2020, the Company held an earnings call with analysts to discuss the Company's financial results and operations for the first fiscal quarter of 2021 (the "October 26 Earnings Call"). *During the call, Davis admitted that the Miami-Dade implementation was doomed from the start, because "we committed to delivering that solution in six weeks,*

*something that should have taken us six months to implement in regular circumstances. Unfortunately, there just wasn't enough time to iron out all the kinks in the interfaces and systems in the short timeframe."* This is backed up by analysts. As noted in an September 10, 2020 William Blair analyst report, "K12 was given a very short implementation timeline of less than a month, compared with a normal timeline of roughly nine months (ideally would have started this process in January 2020)[.]" BMO Capital Markets agreed in its September 17, 2020 analyst report, stating that the short timeline was a contributing factor to the rollout issues. *But K12 never disclosed these timeline issues when touting the Miami-Dade relationship just two months earlier during the August 11 Earnings Call.*

**D.      The Company Had Widespread Technology Problems, Lacked Cyber Protections and Failed to Provide Proper Support and Training**

59.      Confidential Witness ("CW")-1[4] worked for K12 from July 2003 to February 2019 as Senior Vice President – Central Region and then Senior Vice President – Education Policy and External Affairs.  As Senior Vice President – Central Region, her responsibilities included overseeing a large group of schools across the middle of the country; and starting K12's first Arizona school.  In June 2013, CW-1 transitioned to her role as Senior Vice President – Education, Policy and External Affairs, a position that involved overseeing the Company's Chief Academic Officer, data scientists and the Company's overall "academic policy shop."  CW-1 worked remotely from Arizona but traveled frequently to K12 schools across the country and to the Company's headquarter offices in Herndon, Virginia.  CW-1 reported to Defendant Davis.

60.      CW-1 stated that three senior K12 executives who remain at the Company told her that the Company's 2020 pursuit of the Miami-Dade County Public Schools contract was solely at

---

[4] All confidential witnesses are identified with female pronouns to maintain anonymity.

the behest of Defendant Davis and current CEO James Rhyu.  "They negotiated [the contract]. *There was internal guidance from others to not do it, that it required too much work, [and] that the Company was not in a position to support what Miami-Dade needed*."

61.     In addition to the three K12 senior executives, CW-1 stated that she learned about the Miami-Dade situation from a few former K12 employees whom she has since hired at e-learning company StrongMind, where CW-1 is currently the Chief Operating Officer and President. (CW-1 declined to provide the names of the three senior K12 senior executives or the former K12 employees who now work at StrongMind.)

62.     The three K12 senior executives also told CW-1 that K12 did not have sufficient time to "test the stress loads" that were needed to have Miami-Dade students accessing its systems. "The proprietary LMS [Learning Management System] that K12 had would need a lot of configuration and programming to deliver what Miami-Dade needed."   "They hadn't tested appropriately the stress loads of the K12 system – if Miami-Dade kids logged in at the same time, what would they need to do to handle that stress?"

63.     The three senior K12 executives also told CW-1 that *within K12, it was known that the Company needed to conduct "about $6 million worth of work" to deliver what Miami-Dade needed.*  CW-1 stated: "You don't go into a high-profile deal a week before school starts knowing you have to do $6 million work of work and expecting it to go smoothly." "I don't think – as big as K12 is and as skilled as their engineers are – I don't know if it would have been humanly possible to get that work done that quickly from the time they booked the deal to the first day of school."   In regard to the time needed to implement services for Miami-Dade, CW-1 stated: "maybe, optimistically, four months – if they put a pause on all other work in the pipeline."

64.     With respect to past data breaches, *CW-1 disclosed that K12 suffered a "data breach" at one of its California Virtual Academies ("CAVA") schools in December 2015* when a hacker penetrated a firewall and accessed teacher data and potentially also student data. The breached system was external to K12's own systems, but K12 employees who were administering CAVA schools were using the system. She also stated that *in July 2019, K12 experienced another data breach.*

65.     Defendant Davis hired Rob Banwarth in March 2015 as K12's Senior Vice President/Chief Information Officer ("Banwarth").  According to CW-1, *Banwarth, CW-1, and other senior leaders had bi-weekly meetings with Defendant Davis during which Banwarth provided updates about data security and technological issues*.  "A lot of the executives who were there the same point when I was on the team, they have robust discussion."  "I don't imagine they wouldn't have had robust discussions [about data breaches and tech issues]."

66.     With respect to outages, CW-1 stated that, in or about 2017, K12 put into place a new process to respond to outages with the Company's systems where *Banwarth would provide daily written updates to Defendant Davis and other senior executives*.  "Nate [Davis] would most certainly be on the distribution [list] of those [daily written updates]."

67.     CW-2 was Senior Vice President, School Management at K12 from 2018 until early 2019. She reported to Kevin Chavous, President, Academic Policy and External Affairs, who reported to Defendant Davis. CW-2 stated that *Defendant Davis held weekly, face-to-face senior management meetings* in the company's Herndon, VA headquarters offices. The meetings were attended by CW-2, Defendants Davis and Medina; Vincent Mathis, EVP General Counsel; the Chief Academic Officer; the Chief Marketing Officer, and Chavous. CW-2, who regularly attended the meetings, stated that while the meetings typically involved a discussion of "business

topics," ***technological problems and shortcomings were discussed during some of the meetings***. CW-2, who was ***"painfully aware" of the Company's technological problems***, stated: ***"I believe awareness of those [technological problems and shortcomings] was part of the discussion."***

68.     CW-2 read about the issues K12 faced in Miami-Dade County, and commented that the Miami contract was clearly a "rushed situation … ***I think plenty of people in K12 had to have known going in that that contract was going to be incredibly difficult to make work." Asked if K12's initial commitment to implement online learning for Miami-Dade County Public Schools in six weeks was reasonable, CW-2 said, "No," adding that her observation was based on "being in the industry, understanding the state of play in their systems, integrating UX [User Experience] and UI [User Interface]. Just knowing that they're not ready for prime time.*** This stuff is some combination of complicated and not sufficiently up-to-date and insufficiently integrated."  With respect to K12's debacle with the Miami-Dade County Public Schools, CW-2 stated that K12 "had real execution problems."

69.     CW-3 worked for K12 from August 2017 to August 2020 as a Director of Operations. She was based in the Philadelphia, PA area and worked with K12's Insight Pennsylvania Cyber Charter School. She reported to Insight's Executive Director, Michael Frost, and to Regional Operations Manager, Susan Siler.

70.     CW-3 stated that K12 had proprietary software called TotalView that stored student data and also connected to software called Class Connect, where students logged on for live instructional sessions. CW-3 stated that ***TotalView constantly had issues including being difficult to use, not being able to do certain functions, and working poorly. It "never stopped being an issue. We had to hire a lot of people who just would handle all of these little problems that consistently popped up. It was a constant headache."*** CW-3 stated that she raised these concerns

about TotalView with (i) Michael Frost, Executive Director of Insight Pennsylvania Cyber Charter School; (ii) Susan Siler, Regional Operations Manager, via email and during weekly phone calls; (iii) Alison Branch, Director of Compliance; (iv) Eileen Cannistraci, School Operations Insight CEO; and (v) Beth Jones, Insight CFO.  CW-3 stated that Jones "also left [the school] in frustration."

71.    When technology-related problems arose, CW-3 and other staff could file "tickets" using a system called ServiceNow. CW-3 regularly filed tickets in ServiceNow when, for example, the Company's systems went down.

72.    When CW-3 and other staff raised concerns about recurring problems at K12 – such as technological issues with TotalView, the company's back-end system that stored student data – "we were shut up." "It was made very clear that you were not to complain about how the systems were glitchy or didn't work well for us or how they needed to be changed. You would be met with a very harsh reaction, especially [from] Susan Siler or Alison Branch." "If you said to them, 'Hey, could you look into the systems [shutting down],' it was like, 'How dare you ask such a thing!'"

73.    CW-3 stated that she generally raised concerns with Siler and Branch through phone calls, and when doing so regarding tech issues, "you would get a harsh tone of voice." "It would be met with – almost suggesting that we were being lazy, like, 'Why don't you fix it? We've done it. It's easy.' And it was like, 'No, it's not, you've never had to do this.' It would fall on deaf ears."

74.    According to CW-3, Darren Reed, the Company's Senior Vice President and General Manager of School Management, was made aware of ***many of the technological issues plaguing K12***. CW-3 knew this because Frost told her that he had brought the issues to Reed's attention.

75.     CW-3 stated that K12's systems were "stupidly complex," and a lot of K12's staff were "folks who may not have been as tech savvy," and they "really struggled" with the Company's platforms. CW-3 stated that while there was training, it was inadequate.

76.     CW-4 was employed at K12 from July 2017 to February 2020. She was an Academic Advisor based in Birmingham, AL and worked with K12's Alabama Virtual Academy. CW-4, like CW-3, stated that *K12's proprietary TotalView software constantly had issues*. CW-4 added that K12's training for staff was "horrible." When she had questions about how to use a program or perform certain tasks, "nobody really knew the answer to anything," and "My boss didn't really know the answer … You would ask a question, and they would kind of blow you off to the next person, who didn't really know the answer." She also recounted company-wide conference calls with senior executives about four times per year which were not relevant or helpful.

77.     CW-5 worked remotely for K12 from May 2019 until September 2020 as a Related Services Coordinator in Florida. She worked with Caroline Cowart, K12 Related Services Coordinator; Tara Richardson, Director of Related Services; and Amanda Winn, Academic Administrator – Special Programs. Related Services provided services for students with disabilities. She worked with the Tennessee Virtual Academy ("TVA"), the Florida Online School, and the Florida Cyber Charter Academy. CW-5 stated that *after the start of the COVID-19 Pandemic, the organizations that K12 contracted with to provide therapy services at the TVA faced major roadblocks – including bandwidth shortages – that prevented or delayed students from receiving services. These issues occurred occasionally prior to the pandemic but they "increased substantially once COVID hit"* according to CW-5. *These technological problems made the district overseeing TVA "not happy" with K12.*

25

78.     CW-6 worked for K12 from October 2011 until January 2020 as an Online High School Math Teacher and District Testing Coordinator out of K12's office in downtown Phoenix, Arizona. She worked with two online schools, the Arizona Virtual Academy and the Insight Academy of Arizona. CW-6 said that *K12 had "insufficient training" for both staff and teachers when it came to using the company's platform and learning how to teach virtually.* "[K12] had a virtual training system that had recording on there, stuff you had to kind of go through and complete within a certain period of time, but it really wasn't super helpful," she said. "It didn't really prepare anybody" and the insufficient training was a "huge" problem according to CW-6. For example, CW-6 stated that when she transitioned from Online High School Math Teacher to District Testing Coordinator, she received virtually zero training.

79.     CW-6 also stated that K12 had a nationally operated "technical issues hotline" that was supposed to help solve problems, but it was typically not helpful and "rarely solved your problems." "A lot of times, they would just create an open ticket and . . . it wasn't helpful" according to CW-6. "There were a lot of open tickets and closed tickets without any solution."

80.     With respect to K12's commitment to implement online learning for Miami-Dade County Public Schools in six weeks, CW-6 stated that she would expect implementation for such a large school district to take longer and that 6 weeks was on the "short end."

### MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

**Statements Issued During Fourth Quarter, Fiscal Year 2020**

81.     The Class Period begins on April 27, 2020. On that day, K12 filed its Form 8-K with the SEC attaching a press release announcing its financial results for the third fiscal quarter ended March 31, 2020. In the press release, Defendant Davis touted K12's "core competency" in aiding schools and school districts' operation of their online programs, stating, in relevant part:

Looking forward, K12 now sits squarely in the middle of one of the most important changes in our society – distance and digital learning will become an even more important part of how our children learn. ***Our core competency in helping public school districts, private schools, and charter schools operate their online programs positions us well given how the education market is likely to change.***

82.     The Company also held the April 27 Earnings Call with analysts to discuss the Company's financial results and operations.  During the earnings call, Defendant Davis touted the Company's financial results, including the fact that the Company "beat [its] estimates across the board: revenue, adjusted operating income and capital expenditures" which according to him was a result of the "***ongoing strength of [K12's] core business[.]***"  As to K12's technical abilities, Defendant Davis assured investors that, notwithstanding the pandemic's disruption of academic plans and goals for so many students, ***for most users of K12 powered programs, "the academic experience . . . was essentially school as usual."***

83.     Additionally, Defendant Davis made courageous claims regarding K12's readiness and technical abilities to service and administer the sudden surge of online students caused by the pandemic, stating as follows:

Let's talk about the upsides of the pandemic in our business. As I've already said, it's horribly unfortunate for so many people all around the world. ***But we're in the business that helps schools and students in situations exactly like this.*** When the pandemic first started to impact brick and mortar schools, our phones begin to ring off the hook and we saw a sharp increase in traffic on our website. We reached nearly 1 million unique visitors to the k12.com website in February and March, which is a 49% increase year-over-year. Many of those visitors built [*sic*] out lead submission forms. In fact more than 100,000 lead submission forms were completed by parents in the last 2 month [*sic*], a 57% increase over the same time last year.

84.     As to K12's technical support of the thousands of new students whose school districts shifted to virtual learning, Defendant Davis highlighted the Company's efforts in providing solutions supporting and servicing the impacted communities:

Our company has also stepped up in support of communities that were impacted by the nationwide school closures. This includes offering free online curriculum, platforms,

27

*training and technical assistance to students, their families and to school districts*. We're also offering free webinars on best practices for teachers and families, who have been thrust into an online environment for the very first time. To date nearly 70,000 students, teachers and families have signed up for these programs and webinars. These efforts continue to raise interest in and awareness of the blended and online classroom and of *K12's expertise in this area*.

85.     During the Q&A portion of the April 27 Earnings Call, Defendant Davis further assured investors of K12's strength.  When asked about the time it takes to establish a new school with K12's system, Davis said that COVID-19 was "a positive tailwind" that is putting the onus on the school system, stating that "states come to us and say, hey, can we do something here?"  He went even further, professing that online school programs are the way forward if schools "want to be in a position to be able to help students and help your community and help your state."  To this end, Defendant Davis made investors aware of ongoing negotiations and K12's bidding process with a "couple of very large school districts" and "two large cities." He also stated:

> But I think the biggest opportunity for us and for anybody, if, in fact, schools are not open and kids can't go back to school, it's going to be in the institutional business. That's where you would see us providing a program that they run themselves. *We teach their teachers how to teach in an online environment, provide them the ability to enroll students in the curriculum of content and then let them go teach in that environment.*

86.     On April 28, 2020, K12 filed its quarterly report on SEC Form 10-Q for the third fiscal quarter of 2020 (the "3Q20 10-Q"), signed by Defendant Medina.  In it, the Company described its capabilities, including the provision of learning systems for varying degrees of online learning:

> The Company's learning systems combine curriculum, instruction and related support services to create an individualized learning approach. *The Company's learning systems are well-suited for virtual and blended public schools, school districts, charter schools, and private schools that utilize varying degrees of online and traditional classroom instruction, and other educational applications.*

* * *

28

The Company works closely as a partner with public schools, school districts, charter schools, and private schools, enabling them to offer their students an array of solutions, including full-time virtual programs, semester courses and supplemental solutions. In addition to curriculum, systems and programs, the **Company provides teacher training, teaching services, and other academic and technology support services**.

87.     In sections of the 3Q20 10-Q, under the heading of "Risks and Uncertainties" and "Risk Factors," the Company did not adequately disclose risks relating to cybersecurity, data privacy, data breaches, or potential technological weaknesses and vulnerabilities of its platform.

88.     The 3Q20 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by the Individual Defendants stating that the 3Q20 10-Q **"does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"**

89.     The above statements identified in ¶¶ 81-88 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) K12 lacked the technological capabilities, infrastructures, and expertise to support the increased demand for virtual and blended education necessitated by the global pandemic; (ii) K12 lacked adequate cybersecurity protocols and protections to prevent and mitigate cyberattacks; and (iii) K12 was unable to provide the necessary levels of training to teachers, students, and parents.

**Statements Issued During First Quarter, Fiscal Year 2021**

90.     On August 11, 2020, K12 filed its form 8-K with the SEC attaching a press release announcing its financial results for the fourth fiscal quarter and full fiscal year ended June 30,

2020. In it, Defendant Davis highlighted the purportedly smooth operations of K12's platform, stating: ***"[t]he schools we support did not experience disruption….*"**

91.     On the same day, August 11, 2020, the Company held an earnings call to discuss the Company's financial results and operations (the "August 11, 2020 Earnings Call"). During the earnings call, Defendant Davis touted K12's contract with one of nation's largest public schools, Miami-Dade County Public Schools, reiterating K12's readiness to service and administer online learning programs for large public school systems, remarking as follows:

> K12 will provide customized services, including curriculum, assessment tools, teacher training and data management. This will ensure a strong start to the new year for both educators and Miami-Dade's more than 270,000 students that we'll serve. The teachers already employed by Miami-Dade will combine their great teaching with our technology and expertise to provide high-quality instruction in a safe environment. This allows Miami-Dade to retain both teacher jobs and the all-important existing student-teacher relationships.
>
> In alignment with their existing learning goals, Miami-Dade Public Schools teachers and administrators can also customize the online curriculum we're providing, including core subjects and hundreds of electives. ***This shows the flexibility of the K12's technical platform.*** We're thrilled to support Superintendent Carvalho and the innovative solution he and his team has designed. This is just one example of how a large school district can rise to meet the unprecedented challenges of school closures caused by the COVID-19 pandemic*.* We're working with other school districts on their own customized solutions for the fall as well. ***And we stand ready to support schools and school districts of any size during this critical time.***

92.     Defendant Davis closed his prepared remarks by stating that "[K12 is] in the right market at the right time with the right experience ***and technology to take advantage of a large addressable market.*"** Further, in response to an analyst's question regarding demand from school districts, Defendant Davis stated:

> We are seeing increase, however, in school districts who call us and want to use our content and our curriculum ***with more of those contracts this year than we've ever had in any one year before. I mentioned Miami-Dade, there's others we're working on, not yet disclosed***, but maybe not as large as Miami-Dade. I said they are 270,000 students. There are others that are literally anywhere from 10,000 to 100,000 students. So we're seeing more demand there as well.

93.     On August 12, 2020, K12 filed its annual report on SEC Form 10-K for the fiscal

year ended June 30, 2020 (the "2020 10-K"), signed by the Individual Defendants.  Therein, K12

described itself as "an innovator in K-12 online education" with purportedly "distinctive core

competencies that ***allow us to meet the varied needs of our school customers and students[,***

***including]*** our ability to create engaging curriculum, [and] ***train teachers in effective online***

***instruction*** . . . ."

94.     As to K12's readiness to service its Institutional business in the face of the COVID-

19 Pandemic, the 2020 10-K gave assurances of K12's support to schools:

> ***Institutional***
>
> Our Institutional business consists of: (i) Non-managed Public School Programs and
> (ii) Institutional software and services….With the impact of the COVID-19 on education,
> school districts are seeking more complete virtual learning solutions in addition to
> curriculum, including virtual instructional delivery, scheduling, attendance monitoring for
> virtual instructional sessions, teacher professional development, consulting support in
> effective virtual instruction, and special education accommodations. Additionally, districts
> are seeking support for implementations that blend virtual and in-person instruction.
>
> ***To address the growing need for digital solutions and the recently emerging need for***
> ***comprehensive virtual solutions, our Institutional business provides curriculum and***
> ***technology solutions, packaged in a portfolio of flexible learning and delivery models***
> ***mapped to specific student and/or district needs.*** This portfolio provides a continuum of
> delivery models, from full-time Non-managed Public School Programs to individual
> course sales and supplemental options that can be used in traditional classrooms to
> differentiate instruction. The goal of the Institutional business is to partner, primarily with
> U.S.-based public schools and school districts, to provide more options and better tools to
> empower teachers to improve student achievement through personalized learning in
> traditional, blended and online learning environments and to provide comprehensive
> support for teachers and administrators to deliver effective virtual and blended instructions.

95.     The 2020 10-K further emphasized K12's technological expertise, stating that the

Company's "areas of focus" includes, among other things, "***making sure that all of our systems***

***and solutions are easy for teachers, administrators, students, and parents to use***" and providing

a ***"virtual learning platform which supports the scheduling and delivery of instruction…."***

Similarly, K12's "Educational Philosophy" confirms that "students learn better not just with great curriculum, but also great teachers and *technology that allows them to access the content and teachers* in a way that makes learning more engaging and effective."

96.     Critically, the Company affirmatively represented the cybersecurity policies, protocols, and internal controls it purportedly had in place, including firewall technology, and encryption methods to safeguard against data breaches, stating as follows:

> *Cybersecurity.* Our cybersecurity measures and policies include dividing application layers into multiple zones controlled by firewall technology. Sensitive communications are encrypted between client and server and our server-to-server accessibility is strictly controlled and monitored. We have contracted with an outside network and information cybersecurity firm to assist us with monitoring traffic and potential threats that may target our services and systems. *We protect sensitive information through policy and control governance that is validated on a semi-annual basis, and maintain a layered security architecture. Third-party firms are engaged to test our networks, servers and applications for vulnerabilities.* We have prepared an incident response plan that is designed to escalate information regarding material data breaches and cybersecurity attacks to the senior management of the Company. A business-centric information security program has also been adopted that is tailored to adjust to an ever-changing IT compliance and information security threat landscape. Although distributed denial-of-service attacks are frequently attempted, we have not experienced a significant disruption to our business as a result of these attacks.

97.     Unfortunately for the investing public, K12's risk disclosures contained only boilerplate statements, which merely communicated the possibility that K12's systems could experience cybersecurity attack or breach, *by certain "more sophisticated" hackers*.  These same purported risk disclosures were accompanied by additional assurances regarding the safety of K12's systems and databases, including affirmative statements that "[*K12] dedicate[s] personnel and resources to maintain multiple levels of protection to minimize the risk of a cybersecurity attack, malware intrusion or breach[.]*"

98.     The 2020 10-K contained certifications pursuant to SOX signed by the Individual Defendants stating that the 2020 10-K *"does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances*

*under which such statements were made, not misleading with respect to the period covered by this report[.]"*

99.     On August 19, 2020, in a video interview with "On The Move" of Yahoo! Finance, Davis stated: "I'll use Miami-Dade as an example ... and they chose an approach that I think is innovative and allows all of their students to keep up …. ***Teachers [in the Miami-Dade County Public Schools] are using online tools to reach their students*** and that minimizes you know the gap."

100.     The above statements identified in ¶¶ 90-99 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) there was no signed contract with the Miami-Dade County Public Schools; (ii) K12 lacked the technological capabilities, infrastructures, and expertise to support the increased demand for virtual and blended education necessitated by the global pandemic; (iii) K12 lacked adequate cybersecurity protocols and protections to prevent and mitigate cyberattacks; and (iv) K12 was unable to provide the necessary levels of training to teachers, students, and parents.

## THE TRUTH BEGINS TO EMERGE

101.     In late August 2020, reports began to surface that teachers in the Miami-Dade County school system were extremely unprepared for the new school year because they were unfamiliar with K12's learning platform.  According to a Miami Herald article published on August 25, 2020, post-market, and updated on August 26, 2020, Dr. Steve Gallon, III, Vice Chair of the Miami-Dade County School Board, disclosed that ***"[b]ased on the many concerns I have received, it appears that several areas of planning and execution relative to training and new system fell below the expectations we set as a Board and for which employees and parents look forward to."***  Additionally, CBS Miami published an article on August 26, 2020, post-market, that

included a statement by United Teachers of Dade President Karla Hernandez-Mats, that the "***the training for K12 has been ineffective….***"

102.    On this news, the price of K12 common shares fell almost 14% over the course of two trading days, to close at $37.70 on August 27, 2020, on unusually high volume.

103.    On September 2, 2020, the third day of classes, the Miami Herald published an article that revealed that Miami-Dade County Public School students and teachers reported ***numerous technical issues and a total of twelve intermittent cyberattacks that hindered educational efforts.***  K12 knew that it was dependent on the proper functioning of the Miami-Dade County School District's network, yet did not adequately secure its network, or maintain meaningful alternatives that would have enabled K12 to continue to provide its services via alternative means or otherwise mitigate the potential risk of its service being disabled.  The breach of Miami-Dade County School District's network thereby exposed K12's inadequate and insufficient protocols relating to cybersecurity threats and the lack of mitigation measures to ensure the proper functioning of its own systems.

104.    Additionally, perpetual technical problems, and issues with connectivity and audio and video use, triggered an overwhelming amount of complaints from teachers, students, and parents to the officials of Miami-Dade County School District.  In response to the outrage from families and students unable to access and utilize the educational curriculum, the Miami-Dade County School Board called a Board meeting on September 2, 2020 to discuss the many failures of the K12 online platform.  According to the September 2, 2020 Miami Herald article, during the Board meeting, ***Miami-Dade County Public Schools CFO Ron Steiger revealed that Superintendent Alberto Carvalho never signed the $15.3 million no-bid contract with K12, and the school district never paid K12 for the provision of its services and products***.

105.     On this news, the price of K12 common shares fell by 3.3%, to close at $37.55 per share on September 2, 2020.

106.     A Miami Herald article published on September 3, 2020, further exposed the true extent of K12's inadequate and insufficient protocols relating to cybersecurity threats and the lack of mitigation measures to ensure the proper functioning of its own systems. The article revealed that one of the cyber-attacks *was committed by a 16-year-old high school junior who managed to disable the school's network system* on which K12 was critically dependent for the provision of its services.  Barrett Lyon, CEO of cybersecurity firm Netography, noted that the tool used by the 16-year old student *was the "modern-day equivalent" of pulling the fire alarm*.  The article also stated that Mark Rasch, a cybersecurity expert and former federal cybercrimes prosecutor, commented: *"It's a point-and-click program. You don't have to have a great degree of sophistication to launch [a cyberattack.]"*

107.     On this news, the price of K12 common shares fell by almost 7.1%, to close at $34.89 on September 3, 2020.

108.     Unfortunately for the students and teachers in Miami-Dade County, the numerous technical problems and cyberattacks on K12's platform continued into the second week of classes. Teachers and students could not see or hear each other and could not access the educational curriculums.  Furthermore, the content had been deleted while users were booted from the program, leading some students to be falsely marked as absent.  According to a Miami Herald article published before the marked opened on September 10, 2020, the Miami-Dade County School Board called a Board meeting on September 9, 2020 in response to the ongoing issues with the K12 platform. The meeting lasted thirteen hours and featured 400 public speakers.  Parent complaints about K12 were wide-ranging, including: (i) curriculum that was not age-appropriate;

(ii) references to materials that the District had not purchased which made the existing materials "useless;" (iii) lack of support for students with special needs; (iv) insufficient training and time to prepare; and (v) an unreliable system.  Consistent with the parents' complaints, teachers referred to the K12 curriculum as "sub-par."  According to a CBS Miami article published on September 9, 2020 post-market, Dr. Marta Perez, a Miami-Dade Board member, spoke to Defendant Davis. The article stated: "During our conversation, [Defendant Davis] said three times this was not the fault of the administration.  This was not the fault of Alberto Carvalho.  We take full responsibility."  The article also disclosed that Defendant Davis sent a letter to the Board that acknowledged that "[t]he platform . . . needed more work and clearly did not handle Miami-Dade's requirements."  According to the Miami Herald article published on September 10, 2020, pre-market, *the Miami-Dade County School Board meeting culminated in the Board's vote at 2:00 am on September 10, 2020, to stop using K12's online learning platform.*

109.    On this news, the price of K12 common shares plummeted further by 9.5% to close at $30.55 on September 10, 2020, on unusually high trading volume.

110.    As detailed in a September 10, 2020 Motley Fool article, K12 shares sank due to the loss of the Miami-Dade contract.  An analyst report published by William Blair on September 10, 2020 also stated, "We believe this announcement [regarding K12's loss of the Miami-Dade contract] drove the weakness in shares today."

111.    K12's problems were not limited to Miami-Dade County.  On September 15, 2020, within a week of the start of classes, the Beaufort County School Board *began to consider the cancellation of its own $2.75 million contract with K12*.  According to an article published by The Island Packet on September 15, 2020, post-market, and updated on September 16, 2020, in making a motion to terminate the contract on September 15, 2020, Board member John Dowling

36

("Dowling") stated that **"the senior staff has lost any confidence at all" in K12** and a district spokesperson also disclosed that the district had not yet made any payments to K12 pursuant to the contract.

112.    On this news, the price of K12 common shares fell by 4.2%, to close at $29.62 on September 16, 2020.

113.    According to a September 17, 2020 article published by The Island Packet, on September 17, 2020, after the Beaufort County School Board discussed the contract in an executive session, Dowling moved to "accept the Superintendent's recommendation" to terminate the K12 contract, "recognizing the fact that contractual obligations were not met." ***The Board voted to terminate the K12 contract***.  In a statement after the vote, Superintendent Frank Rodriguez cited his disappointment in K12's ability to meet the Board's expectations.

114.    Additionally, on September 17, 2020, the Miami Herald published an article disclosing that ***the Office of the Inspector General for Miami-Dade County Public Schools was investigating Miami-Dade County Public Schools Superintendent Alberto Carvalho's nonprofit foundation regarding a solicited donation from K12 of $1.57 million***.

115.    On this news, the price of K12 common shares fell by 4.5%, to close at $28.30, on September 17, 2020.

## ADDITIONAL SCIENTER ALLEGATIONS

116.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Defendants, by virtue of their

receipt of information reflecting the true facts regarding K12, their control over, and/or receipt and/or modification of K12's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning K12, participated in the fraud alleged herein.

117.   Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Individual Defendants.  For example, Defendants acted intentionally or recklessly when they touted K12's contract with Miami-Dade County Public Schools, one of the largest school systems in the Country, *when no such contract was ever signed by the Miami-Dade County Public School System*.  Similarly, Defendants acted intentionally or recklessly in touting the quality and effectiveness of the Company's cybersecurity capabilities, including firewall protection and encryption methods to protect against breaches, disablement, and privacy invasions. These promises of security were false.  Even a 16-year-old high school student who breached the school's network disabled K12's ability to continue to operate and function.  Defendants knew these statements were false or acted with reckless disregard as to their truth or falsity.

118.   The Individual Defendants, because of their positions with K12, made and/or controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts

38

specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were materially false and misleading.  As a result, each of these Defendants is responsible for the accuracy of K12's corporate statements and are therefore responsible and liable for the representations contained therein.

**A.     The Individual Defendants Had an Opportunity to Commit Securities Fraud**

119.    As officers of the Company, the Individual Defendants had an opportunity to commit securities fraud.

**B.     The Fact that the Alleged Misstatements Concerned the Company's Core Business Further Supports an Inference of Scienter**

120.    The alleged fraud relates to K12's core business. It concerns the "General Education" segment, a segment which accounts for approximately 85% of the Company's total revenue.  The Individual Defendants, in their roles as top-level executives, would have been aware of all relevant issues impacting the very core of their business.

**C.     After the Class Period Ended, Defendant Davis Admitted that the Miami-Dade Implementation Was Doomed from the Start**

121.    On October 26, 2020, the Company held an earnings call with analysts to discuss the Company's financial results and operations for the first fiscal quarter of 2021. During the call, ***Davis admitted that the Miami-Dade implementation was doomed from the start, because "we committed to delivering that solution in six weeks, something that should have taken us six months to implement in regular circumstances.  Unfortunately, there just wasn't enough time to iron out all the kinks in the interfaces and systems in the short timeframe."***

122.    K12 never disclosed these timeline issues when touting the Miami-Dade relationship just two months earlier during the August 11, 2020 Earnings Call.

**D.    Defendants Had Access to Real-Time Data Alerting Them to All Relevant Issues**

123.    The Company's 2020 10-K confirms that Defendants had access to real-time data that alerted them to data breaches and cybersecurity issues; and knew about K12's subpar technological infrastructure and cybersecurity protections.   The 2020 10-K states the following under "Technology" with respect to "Cybersecurity" and "Physical Infrastructure:"

> *Cybersecurity… **We have prepared an incident response plan that is designed to escalate information regarding material data breaches and cybersecurity attacks to the senior management of the Company**….*
>
> *Physical Infrastructure… **Our Network Operations Center (NOC) monitors our application and infrastructure ecosystem on a 7 X 24 X 365 basis, tracking our availability, scalability and performance**….*

**E.    CEO Davis Was Hands-On with Issues Faced by K12**

124.    As stated earlier, CW-2 stated that Defendant Davis held weekly, face-to-face senior management meetings in the company's Herndon, VA headquarters offices. The meetings were attended by CW-2, Defendants Davis and Medina; Vincent Mathis, EVP General Counsel; the Chief Academic Officer; the Chief Marketing Officer, and Chavous. CW-2, who regularly attended the meetings, stated that while the meetings typically involved a discussion of "business topics," technological problems and shortcomings were discussed during some of the meetings. CW-2, who was "painfully aware" of the Company's technological problems, stated: "I believe awareness of those [technological problems and shortcomings] was part of the discussion."

125.    CW-2 stated that Defendant Davis "expected people to solve things. He would get upset when things weren't solved, when timelines weren't being met. He could drill into detail in a meeting if it was clear to him something wasn't going right."

126.    With respect to outages, CW-1 stated that, in or about 2017, K12 put into place a new process to respond to outages with the Company's systems where Banwarth would provide

daily written updates to Defendant Davis and other senior executives. "Nate [Davis] would most certainly be on the distribution [list] of those [daily written updates]."

127.     CW-7 worked for K12 from October 2012 to June 2019 as Director of Texas Operations, as a member of the Government/Public Affairs and Academic Policy Team, and as a Director of Board and Partner Relations. She reported to Mary Gifford, Senior Vice President – Education, Policy and External Affairs, who reported to Defendant Davis. CW-7 stated that she attended many meetings with Defendant Davis regarding "policy recommendations that would make sense for students," and "[i]f there was something that he really cared about, he would dive in pretty deep."

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

128.     Plaintiffs bring this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on Plaintiffs' own behalf and as representatives of a class, consisting of all those who purchased or otherwise acquired K12 shares during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

129.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Throughout the Class Period, K12 shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be readily identifiable from information and records in the possession of Defendants or the

41

Company's transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

130.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and members of the Class sustained damages from the same wrongful conduct of Defendants.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws described herein.

131.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Class.  Plaintiffs are adequate representatives of the Class and have no interest which is adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

132.    Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class.  These common questions of law include, without limitation:

- whether statements made by Defendants to investors during the Class Period misrepresented material facts about the business and operations of the Company;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of K12 shares during the Class Period were artificially inflated due to Defendants' conduct described herein; and

- whether the members of the Class have sustained damages, and, if so, what is the proper measure of damages.

133.    A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single

forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

134.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

135.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

136.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiffs and the Class;

- K12 securities were traded on the NYSE and were covered by numerous analysts;

- K12 securities were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of K12 securities; and

- Plaintiffs and Class members purchased and/or sold K12 securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

137.    As a result of the foregoing, the market for K12 securities promptly digested current information regarding K12 from all publicly available sources and reflected such information in K12's share price.  Under these circumstances, all purchasers of K12's securities during the Class

Period suffered similar injury through their purchase of K12's securities at artificially inflated prices.  Thus, a presumption of reliance applies.

138.    Accordingly, Plaintiffs and Class members are entitled to a presumption of reliance upon the integrity of the market.

139.    In the alternative, Plaintiffs and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects, information that Defendants were obligated to disclose, positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

140.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

141.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved false statements which they knew to be false or deliberately disregarded whether they were in fact true or false in that they contained misrepresentations and failed to disclose material facts to make the statements made not misleading.

142.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with purchases of K12 securities during the Class Period.

143.     Defendants acted with scienter because they knew that the statements issued in the name of K12 were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements.   Defendants, through receipt of information reflecting the true facts about K12, and their control over K12's allegedly materially misleading statements, participated in the fraud complained of herein.

144.     The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by K12, and intended to deceive Plaintiffs and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other K12 employees to investors, including Plaintiffs and Class members.   These misrepresentations and omissions were material.   A reasonable investor would consider the facts, such as a lack of a contract with a large customer like Miami-Dade County Public Schools, important in deciding whether to buy K12 securities and would have viewed the aggregate of information available to be significantly altered by the disclosure of this and other material omitted facts.

145.     Pursuant to the foregoing, the price of K12 securities were artificially inflated during the Class Period.  Due to their lack of knowledge of the false nature of statements made by Defendants, Plaintiffs and Class members relied on the statements made by Defendants and/or the

integrity of the market price of K12 securities during the Class Period in purchasing K12 securities at prices that were artificially inflated due to false and misleading statements made by Defendants.

146.    Were Plaintiffs and Class members made aware that the market price of K12 securities were artificially and falsely inflated by misleading statements made by Defendants, and by material adverse information that Defendants failed to disclose, they would not have purchased K12 securities at artificially inflated prices, or purchased them at any price.

147.    Based on the wrongful conducted alleged herein, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

148.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and Class members for significant damages suffered via their purchases of K12 securities during the Class Period.

## SECOND CLAIM FOR RELIEF

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

149.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

150.    During the Class Period, the Individual Defendants were involved in the management and operation of K12's business affairs.  Due to their senior positions, they had knowledge of adverse non-public information regarding K12's lack of data security and vulnerabilities of the platform, the lack of adequate training for students, teachers, and parents, and that the contract with the Miami-Dade County Public School District was never fully executed.

151.    As directors and/or officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding K12's business, financial condition and results of operations, and to correct promptly any public statements issued by K12 which were materially false or misleading.

152.     Due to their positions of authority at K12, the Individual Defendants controlled the contents of various public filings, press releases and reports which K12 disseminated in the market during the Class Period.  During the Class Period, the Individual Defendants utilized their authority to cause K12 to execute the wrongful acts alleged herein. The Individual Defendants were therefore "controlling persons" at K12 pursuant to Section 20(a) of the Exchange Act.  On this basis, they were participants in the unlawful conduct alleged which caused the prices of K12 securities to be artificially inflated.

153.     Based on the conduct described above, the Individual Defendants are liable for the violations committed by K12 pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully demand relief as follows:

A.     Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

B.     Awarding damages in favor of Plaintiffs and members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.     Awarding Plaintiffs and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D.     Awarding Plaintiffs and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E.     Directing such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial.

Dated:  April 5, 2021

Respectfully submitted,

**THE KAPLAN LAW FIRM**
*/s/ Matthew B. Kaplan*
Matthew B. Kaplan
VSB No. 51027
1100 N. Glebe Road, Suite 1010
Arlington, Virginia 22201
Telephone: (703) 665-9529
mbkaplan@thekaplanlawfirm.com

*Liaison Counsel for the Proposed Class*

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
Villi Shteyn (admitted *pro hac vice*)
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
bszydlo@pomlaw.com
vshteyn@pomlaw.com

*Counsel for Plaintiffs and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 5, 2021, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by email to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's CM/ECF System.


<div align="center" style="text-align:right">

<u>*/s/ Matthew B. Kaplan*</u>
Matthew B. Kaplan

</div>